838 F.2d 1365
 56 USLW 2540, Fed. Sec. L. Rep. P 93,659,
RICO Bus.Disp.Guide 6885
 Quincy A. JAMES, Individually and As Administrator for Lott
and James Self-Employment Profit Sharing Plan,
Plaintiff-Appellant, Cross-Appellee,
v.
NICO ENERGY CORP., et al., Defendant-Appellees, Cross-Appellant.
 No. 86-1349.
 United States Court of Appeals,
Fifth Circuit.
 March 7, 1988.
 
 Charles D. Cole, Jr., Newman, Schlau, Fitch & Burns, New York City, Guy C. Fisher, Austin, Tex., Newton Schwartz, Houston, Tex., for James.
 William J. Albright, A. Erin Dwyer, Ernest E. Figari, Jr., Johnson & Swanson, Dallas, Tex., for Nico Energy Corp., et al.
 Appeals from the United States District Court for the Western District of Texas.
 Before BROWN, POLITZ and JOLLY, Circuit Judges.
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 Based upon his belated interpretation of an option letter included in an oil investment offering in which he was participating, and in which he made a profit in excess of $1.5 million, the plaintiff, Quincy A. James, complains that Nico excluded him from investing in additional oil wells to which the option letter entitled him. James brought suit against Nico in federal district court, alleging, inter alia, breaches of contract and fiduciary duty, securities law violations, RICO violations and state fraud claims. The district court dismissed most of these issues by way of summary judgment and directed verdict. Upon a jury verdict, however, the court awarded James $325,000 for breach of contract. Both parties appeal. We affirm the district court's summary judgment dismissals and reverse the jury award.
 
 
 2
 * Although one of the parties may be correct in his somewhat purple assertion that this case has its genesis "in greed, the cruelest emotion that inhabits the heart of man," that question is certainly not for us to judge and we decline to decide this case by balancing the human qualities of the parties. Whatever motive drives this lawsuit, it all began in early January 1979 when James Dobos and John Driver, two of the principals of Nico Energy Corporation, acquired an oil and gas lease covering a 1,515-acre tract of land located in Burleson County, Texas, known as the "Whitener Lease." Shortly thereafter, Dobos and Driver obtained drilling rights through oil leases on an adjacent 615-acre tract of land known as the "Subdivision Lease" and an additional 88-acre tract of land known as the "Linda Lease." Dobos, Driver and Don Longan, then formed Nico Energy Corporation in order to handle their oil and gas investments on these properties. Nico's total oil and gas leasehold on the three tracts amounted to 2,218 acres.
 
 
 3
 After preliminary tests indicated that oil existed in commercial quantities on the Whitener Lease, the principals of Nico decided to drill an exploratory well on that tract. The Whitener Lease consisted of 711 acres of nonflood-plain land and 804 acres of land lying in a government flood plain. Nico's first exploratory well was to be drilled on the nonflood-plain land and under the spacing rules of the Texas Railroad Commission, which required Nico to designate 80 acres surrounding the exploratory well as the well site.
 
 
 4
 In order to raise capital for drilling the exploratory well, Nico decided to make a private offering to potential investors. The private offering consisted of: (1) a private placement memorandum, describing the risks of the investment and the criterion necessary for investment; (2) a participation agreement delineating the terms of the investment; and (3) a cover letter (option letter), defining the option to be given all investors. The private placement memorandum further warned potential investors that: "No person has been authorized to make representations or furnish any information with respect to this drilling prospect other than the information set forth in this memorandum or other written information furnished by Nico Energy Corporation." The memorandum also stipulated that, by investing in the first well: "The investor will not acquire an interest in said leases except the above-mentioned 80 acres." The option letter which served as the cover letter for the private offering stated that:
 
 
 5
 If after due consideration you should elect to participate in this endeavor, you will have the option to participate in subsequent wells on an additional 700 acres (approximately) to be designated by Nico from acreage it presently has under lease. This option right will remain in effect only so long as you participate in each offered prospect; that is, once you choose not to participate in offered well, this option right shall cease and be of no further force and effect.
 
 
 6
 In early September 1979 Quincy James began his involvement in the program when he bought two shares of the private offering. James, an experienced trial lawyer practicing in Houston, read all the forms found in the private offering before signing the participation agreement. Soon after the offering, the exploratory well was drilled and began producing at a profit. In the ensuing two years, five more investor wells were drilled on the Whitener nonflood-plain area and, in addition, five noninvestor wells were drilled by Nico in the same area. The noninvestor wells were funded solely by Nico. All eleven wells were successful. After the drilling of these eleven wells in the nonflood-plain area, Nico sold its interest in the Whitener Lease to an oil exploration company ("Buyers"). The Buyers offered James the opportunity to participate in the drilling of a seventh investor well on the Whitener Lease, and James agreed. Sometime later, James was also offered the opportunity to invest in an eighth investor well on the Whitener Lease and he declined the offer. Future participation rights were subsequently cancelled under the terms of the option letter. As a result of the successful investor wells on the Whitener Lease, James received in excess of $1,866,000 for his total investment of $317,000.
 
 
 7
 The focus of James' dissatisfaction with the investment program centers on the interpretation of the option letter included in the private offering. James interprets the option letter as giving him the right to invest in all of the wells drilled on the 711-acre area constituting the nonflood-plain region of the Whitener Lease. Thus, James asserts that he was defrauded of additional profits by Nico's failure to allow his participation in the five noninvestor wells that Nico drilled.
 
 II
 
 8
 Using a broadside approach, James brought suit in federal district court, alleging several wrongs, including securities violations under section 17(a) of the 1933 Securities Act, Rule 10b-5 of the Securities Exchange Act of 1934, and Texas securities laws, Tex.Rev.Civ.Stat.Ann. art. 581-1, et seq.; state statutory and common law fraud; RICO violations; breach of fiduciary duty and breach of contract. Before trial, the district court granted Nico partial summary judgment dismissing James' claims for securities fraud, statutory fraud, and common law fraud. The district court, however, declined to dismiss James' breach of contract claim, notwithstanding Nico's argument that it violated the statute of frauds. After the presentation of evidence at the trial, the district court entered a directed verdict against James on the breach of fiduciary duty claim and the section 1962(a) RICO claim. The jury was thus permitted to decide James' claims for RICO violations under section 1962(c) and (d) and James' claim for breach of contract. The jury rejected the RICO claims. The jury, however, concluded that James suffered damages in the amount of $1,300,000 for NICO's breach of the option letter, but was estopped from asserting his right of recovery in three of the five noninvestor wells that Nico drilled.[1] Thus, James' final award was reduced to $325,000. The trial court entered judgment for James in the amount of $325,000 and denied his post-trial request for attorney's fees, prejudgment interest and costs.
 
 
 9
 In the appeal before this court, James contests the district court's summary judgment and directed verdict rulings as well as the court's ruling on litigation costs. James also contends that estoppel should not bar his breach of contract claim in this situation. Nico cross-appeals and asserts that James' breach of contract claim is barred by the statute of frauds. Nico further objects to the district court's admission of parol evidence to explain the option letter.
 
 III
 
 10
 We first address the breach of contract claim. Through the introduction of parol evidence and by the process of pasting and cutting, James argues for the following interpretation of the option letter: "You will have the option to participate in [all] subsequent wells [to be designated by Nico] on an additional 700 acres (approximately) ... [of nonflood-plain land derived] from acreage which it presently has under [the Whitener] Lease."[2] James attempts to support this interpretation of the option letter by introducing parol evidence. At the trial, James was permitted to testify to a conversation with Dobos during which, he asserted, Dobos verbally identified the larger tract, from which the option acreage was to be drawn, as consisting exclusively of the Whitener Lease, and further verbally identified the "700 acres" mentioned in the option letter as the acreage of the Whitener Lease lying outside the flood plain.
 
 
 11
 James was also permitted to testify that, during the same conversation, Dobos also granted him a verbal option on that portion of the Whitener Lease lying within the flood plain (804 acres). Thus, James argues that this verbal option shows, by a process of reverse identification, that the "700 acres" referred to in the option letter meant the 711-acre tract of land outside the flood plain. In addition, James asserts that at the time of the initial private offering, government regulations prohibited the drilling of oil wells in the flood-plain area of the Whitener Lease; thus, only the nonflood-plain land was subject to the drilling program. Finally, James introduced maps and charts that divide the Whitener Lease between the nonflood-plain acreage and the acreage encompassing the flood plain. James relies on all of the preceding parol and extrinsic evidence as proof of Nico's breach of contract.
 
 
 12
 Nico looks at this case differently. Nico contends that the option letter gives it the unqualified right to select the acreage subject to the option and that the selection can be made by Nico from whatever acreage it has under lease. Support for Nico's position is found in the language of the option letter and in trial testimony that disputes James' version of the parties' conversations relating to the option letter. In addition, Nico relies upon evidence suggesting that no restrictions existed on the drilling of wells in the flood-plain area of the Whitener Lease. Finally, Nico argues that because parol and extrinsic evidence are required to identify the 700 acres referred to in the option letter, the statute of frauds bars enforcement of any alleged contract represented by the option letter.
 
 
 13
 Given all the testimony and other evidence admitted to explain the option letter, both Nico's and James' contract interpretations are plausible. We need not pick and choose between these interpretations, however, because the statute of frauds clearly controls this case. Lockhart v. Williams, 192 S.W.2d 146 (Tex.1946); Stovall v. Poole, 382 S.W.2d 783, 784 (Tex.Civ.App.-Waco, 1964, writ ref'd).
 
 
 14
 Under Texas law, a writing, in order to satisfy the statute of frauds, "must furnish within itself or by reference to some other existing writing, the means or data by which the land to be conveyed may be identified with reasonable certainty." Morrow v. Shotwell, 477 S.W.2d 538, 539 (Tex.1972). Thus, the initial inquiry is whether the option letter, in referring to acreage Nico had under lease, identified with reasonable certainty the tract of land subject to conveyance; that is, the Whitener Lease, since Nico also owned the "Subdivision Lease" and the "Linda Lease" (see infra ). It is plain that the option letter does not identify the acreage, nor does the letter refer to "some other existing writing" that would identify the land. James points out, however, that the option letter was attached to the private placement memorandum and the participation agreement. James further notes that the private placement memorandum names only the Whitener Lease as the area where oil wells will be drilled. Thus, James argues, though somewhat weakly, that the option letter acreage, through this investment agreement language, is restricted to the 1,515 acre Whitener Lease.
 
 
 15
 Assuming, without deciding, that James did establish that the private placement memorandum and hence the Whitener Lease was sufficiently referred to by the option letter, we must then move to a second step of the inquiry: whether the smaller tract of land within the Whitener Lease described as "700 acres (approximately) to be designated by Nico" is described with sufficient specificity. In the case of J.B. Williams v. Ellison, the Texas Supreme Court dealt with a similar problem. 493 S.W.2d 734 (Tex.1973). In Ellison, the purchaser of a tract of land sought specific performance of an option giving the purchaser the right to buy "an additional ten acres" of land adjacent to the first tract. Unlike the present case, in which the option letter contains almost no terms descriptive of the "additional 700 acres," the option contract in Ellison did note that the additional acreage would be adjacent to the first tract (and also excluded certain acreage within the grantor's remaining tract from the option contract). 493 S.W.2d at 736. The Texas Supreme Court nevertheless held the contract unenforceable because the property description could not be interpreted with reasonable certainty. It is thus clear that the option letter does not describe the 700 acres with the degree of certainty required by Ellison to pass muster under the statute of frauds.[3]
 
 
 16
 In any event, James' reading of the option letter fails for other reasons. James contends that the "additional 700 acres" described land all of which was outside the flood plain. Since the private placement memorandum had already set aside an initial 80 acres of the nonflood-plain land found in the Whitener Lease, only 631 acres of nonflood-plain land remained in the Whitener Lease to satisfy James' option letter. In order to satisfy the terms under James' interpretation, Nico would have to include approximately 69 acres of flood-plain land in order to meet its 700-acre description.
 
 
 17
 Finally, in concluding, we note that much of James' case rests upon his own oral testimony purporting to explain the contract. We believe that this situation, where one party contends that it was told something, and another party says that it was told something completely different, is just the situation that was meant to be addressed by the statute of frauds. If such oral testimony were allowed to control an agreement challenged under the statute of frauds, the statute would, in effect, be meaningless. Any written agreement, no matter how vague, would survive a statute of frauds challenge in such a situation. This is exactly what James has attempted to do in this case. We therefore set aside the jury verdict finding a breach of contract and the judgment based thereon.[4]
 
 IV
 A.
 
 18
 We next address the district court's grant of summary judgment dismissing James' claims for securities fraud, statutory fraud and common law fraud. In the district court, James asserted three separate violations of securities laws: (1) section 17(a) of the Securities Act; (2) section 10(b) and Rule 10b-5 of the Exchange Act; and (3) state securities claims under article 581-1, et seq. of Tex.Rev.Civ.Stat.Ann. All three claims were dismissed by the trial court on summary judgment. James, however, appeals only the Rule 10b-5 claim.
 
 
 19
 We will assume that the option letter, considered with the investment package, constitutes a "security" within the meaning of the 1933 Act and the 1934 Act. We will also assume that James has established all of the elements sufficient to survive summary judgment of a Rule 10b-5 claim except injury. In other words, we will assume that James presented evidence of a material misrepresentation or omission, scienter and reliance. See Shores v. Sklar, 647 F.2d 462, 468 (5th Cir.1981), cert. denied, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); see also Hazen, The Law of Securities Regulation Secs. 13.4-13.6 (1985). The only remaining issue is whether James has suffered a compensable injury under Rule 10b-5.
 
 
 20
 In a typical 10b-5 case involving defrauded buyers, recovery for damages is only allowed under an out-of-pocket rule, i.e., the difference between the market price of the stock and the price that the plaintiffs paid. James v. Meinke, 778 F.2d 200, 205 (5th Cir.1985). This rule is one of actual damages and does not include "loss of speculative profits." Wolf v. Frank, 477 F.2d 467, 478 (5th Cir.), cert. denied, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973). Thus, in the case of defrauded buyers, if the market value of the stock is greater than the price paid for the stock, then no out-of-pocket injury exists. See Wolf v. Frank, 477 F.2d at 478.
 
 
 21
 James, however, argues that the out-of-pocket rule should not be applied in this case, but rather argues that he is entitled to a share of Nico's profits from its noninvestor wells. In support of his contention, James relies on the Supreme Court case of Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In Affiliated Ute, the Supreme Court allowed defrauded sellers to recover the profits from the resale of their stock by the defendant. This decision, however, does not allow us to ignore the controlling precedent of the Fifth Circuit requiring the application of the out-of-pocket rule in the case before us. Affiliated Ute only provides that in appropriate situations involving sellers of securities, the market value of the stock for purposes of the out-of-pocket rule may include consideration of future developments. See Siebel v. Scott, 725 F.2d 995, 1001 (5th Cir.1984), cert. denied, 467 U.S. 1242, 104 S.Ct. 3515, 82 L.Ed.2d 823 (1984). This means that if the fraudulent buyer later sells at a profit, the later price may be deemed the market value of the stock for the purposes of calculating the out-of-pocket injury. Id. The market value is simply measured at a reasonable time after the sale, i.e., after the concealed information has been disclosed to the general public and the stock reflects its true value. See Dupuy v. Dupuy, 551 F.2d 1005, 1025 (5th Cir.), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).
 
 
 22
 Thus in the case before us, the rationale for determining injury under the disgorgement rubric will not benefit James. If, as James argues, we consider future developments here, the fair market value of the security becomes worth several times more than James paid for it; in other words, if the market value is measured at some appropriate time after the sale, when all information has been disclosed, and the true value of the security has been determined, and then compared to the price of the security at the time it was offered and purchased, James can demonstrate no injury even under the calculation rationale of disgorgement. Obviously, to say that James suffered an injury in the security transaction cannot be taken seriously. Far from showing a loss by whatever rationale, the evidence shows that James actually made a net profit in excess of $1.5 million or a gain of approximately 500%. Under these circumstances we find no reason in equity or policy or precedent to apply any rule that is an exception to the traditional out-of-pocket measure of damages. Since James cannot prove a compensable injury, the district court was correct in granting summary judgment against his 10b-5 claim. See, e.g., Wolf v. Frank, 477 F.2d at 478-79.
 
 B.
 
 23
 We turn now to address James' claims of state statutory fraud, Tex.Bus & Com.Code Sec. 27.01, and common law fraud. These claims were decided by the district court on summary judgment. The district court held that any statements or omissions made by Nico were at most a failure to disclose a likely future event and did not constitute an affirmative misrepresentation of fact. Since under Texas law a statutory fraud claim requires proof of an affirmative misrepresentation of fact, concealment of a material fact, a false promise, or an omission in the case of a fiduciary relationship, the district court granted Nico's summary judgment motion under Fed.R.Civ.Proc. 56(c). See, e.g., Chemetron Corp. v. Business Funds, Inc., 682 F.2d 1149 (5th Cir.1982). In his brief before us, James does not contest the court's understanding of the law, but rather contends that the district court misunderstood his pleadings. He argues that none of the misrepresentations he alleged related to likely future events, but indeed were affirmative misrepresentations of present facts.
 
 
 24
 The only question for us is whether there was a disputed issue of fact before the district court that would have made summary judgment inappropriate; that is, did James present some timely evidence of an affirmative misrepresentation of fact that barred the court from entering its summary judgment on his statutory fraud claim? In determining whether the district court properly granted summary judgment, we are guided by the principles delineated in Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In Celotex the Supreme Court noted that after the moving party has met its burden of informing the district court of the relevant portions in the pleadings and any supplemental documents "which it believes demonstrate the absence of a genuine issue of material fact," then the opposing party must "make a showing sufficient to establish the existence of an element essential to that party's case ..." or else summary judgment will be entered. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). See also Leonard v. Dixie Well Service & Supply, Inc., 828 F.2d 291, 294 (5th Cir.1987). Where the nonmoving party bears the burden of proving an issue at trial, as in this case, that party cannot rest upon its pleadings, but must produce tangible evidence suggesting that a genuine issue of fact exists. Celotex, 106 S.Ct. at 2553. Although James argues that affirmative misrepresentations were made to the effect that he would have an opportunity to participate in all subsequent wells, he points to no evidence that he presented to the district court that would support this contention.[5] Even James' pleadings, and apparently the theory upon which he opposed summary judgment on the statutory fraud claim, merely demonstrate that Nico failed to tell James that it would drill noninvestor wells in the nonflood-plain area. The district court therefore properly determined that there was no affirmative misrepresentation of a material fact and thus properly entered summary judgment against James on the statutory fraud claim.
 
 
 25
 Finally, there remains the common law fraud claim. The district court dismissed this claim without explanation. It is nevertheless clear that summary judgment against James was properly granted on this claim since there was no evidence before the court when summary judgment was granted that showed a misrepresentation of a material fact, to wit, that James would have an opportunity to participate in all wells drilled in the nonflood-plain area. See Meyers v. Moody, 693 F.2d 1196, 1214 (5th Cir.1982), cert. denied, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983).
 
 V
 A.
 
 26
 We turn now to James' RICO claims. At trial, James alleged violations of 18 U.S.C. Sec. 1962(a), (c) and (d).
 
 
 27
 The district court submitted the section 1962(c) and (d) claims to the jury, but granted a directed verdict on the section 1962(a) claim.[6] The jury found that Nico did not violate either section 1962(c) or (d). James now argues that the district court erred in not submitting his section 1962(a) claim to the jury. He maintains that sufficient evidence existed on each element of his section 1962(a) claim for the jury to have found a violation. We need not address the merits of this claim, however, because an examination of the record reveals that the error, if any, was harmless. See Foster v. Ford Motor Co., 621 F.2d 715, 719-20 (5th Cir.1980). The court did submit to the jury the question whether Nico, in conducting its oil drilling investment program, had violated 18 U.S.C. Sec. 1962(c) and (d). Under the section 1962(c) claim, the jury was requested to determine whether any person connected with an interstate enterprise conducted such an enterprise through a pattern of racketeering activity. Specifically, the only element of the alleged section 1962(c) violation in dispute was whether NICO conducted its oil well drilling program through a pattern of racketeering activity. The jury verdict resolved this issue against James' contention. It follows that Nico could have derived no income from a pattern of racketeering activity since no such activity was found to exist. We are therefore convinced that under these circumstances, where the essential issue was presented to and rejected by the jury, any error in not presenting the section 1962(a) claim to the jury was harmless error and we affirm the district court's directed verdict on this claim.
 
 B.
 
 28
 Finally, James argues that the court erred by refusing to submit to the jury his claim for breach of fiduciary duty. His argument is simply that the investment program of drilling oil wells constituted a joint venture which, under Texas law, creates a fiduciary relationship between the parties. Rankin v. Naftalis, 557 S.W.2d 940, 944 (Tex.1977); Hamilton v. Texas Oil & Gas Corp., 648 S.W.2d 316, 320-21 (Tex.App.-El Paso 1982, no writ). An essential element for a joint venture under Texas law is the mutual right of control of the enterprise. Hamilton, 648 S.W.2d at 321. Since James admits that his only involvement in the wells was limited to investment of capital and that Nico had the sole right of control in the drilling and operating of the wells, the element of mutual control was lacking. See Ayco Development Corp. v. G.E.T. Service Co., 616 S.W.2d 184, 186 (Tex.1981); Hamilton, 648 S.W.2d at 321. Thus, Nico did not have a fiduciary duty to James by virtue of their business relationship[7] and the district court properly granted summary judgment in Nico's favor.
 
 VI
 
 29
 In conclusion, James recovers nothing. The statute of frauds bars the only recovery the jury gave him. His lack of injury bars his security fraud claims. His failure to demonstrate an affirmative misrepresentation of fact forecloses any recovery on his state fraud claims. The jury finding of no pattern of racketeering activity eliminates his RICO claim. And finally, lack of mutual control over the oil drilling operation precludes his breach of fiduciary claim. In short, James came to this court with his $1.5 million profit and he leaves with his $1.5 million profit.
 
 
 30
 AFFIRMED IN PART, REVERSED IN PART and RENDERED.
 
 
 
 [1]
 This finding was based upon the trial evidence which showed that James acquiesced in Nico's interpretation of the option letter by not objecting to the noninvestors wells upon becoming aware of them and by agreeing to reassign a portion of his acreage for a noninvestor well. James raises the estoppel finding of the jury as a major issue in the case but since we reject the breach of contract claim based on the statute of frauds, we need not determine whether James was estopped from claiming breach of contract
 
 
 [2]
 The actual language found in the option letter states: "You will have the option to participate in subsequent wells on an additional 700 acres (approximately) to be designated by Nico from acreage which it presently has under lease."
 
 
 [3]
 We completely reject James' argument that the option letter can be read to specify the 700 acres of the Whitener Lease to which it is referring. Pursuant to common English usage and ordinary contract interpretation, the option letter provides that the 700 acres are to be designated by Nico
 Nor can James furnish a further description of the 700 acres referred to in the option letter by parol evidence. When a conveyance of real property describes a tract of land only by quantity and as being a part of a larger tract, parol testimony cannot be admitted into evidence because the nucleus of the description in the conveyance itself is insufficient to allow extraneous evidence to describe further the land. Smith v. Sorelle, l26 Tex. 353, 87 S.W.2d 703, 705 (1935). Moreover, the documentary evidence that James offered is inadmissible because there is no reference to such documents, directly or indirectly, in the option letter or the private placement memorandum. Matney v. Odom, l47 Tex. 26, 210 S.W.2d 980, 984 (1948).
 We also note that James cannot rely on Hooks v. Bridgewater for his contention that the 700 acres referred only to nonflood-plain land because James paid no consideration for the noninvestor wells, took possession of no noninvestor wells, and made no improvements in connection therewith. Hooks, 111 Tex. 122, 229 S.W. 1114 (1921).
 Finally, we note that the only theory upon which the option letter may be enforceable under the statute of frauds is under the "seller's selection clause" exception, i.e., the option letter survives the statute of frauds if Nico has the unqualified right to designate which 700 acres is subject to the option. See Tiller v. Fields, 301 S.W.2d 185 (Tex.Civ.App.-Texarkana 1957, no writ). Such a construction of the option letter, however, is contrary to James' contention and would be of no benefit to him since there is no contention that Nico violated the option letter by failing to designate some of the acreage for its investor program.
 
 
 [4]
 Since the jury award for breach of contract is voided by the applicability of the statute of frauds, both the estoppel issue and the district court's ruling concerning the recovery of litigation expenses are moot
 
 
 [5]
 Although the option letter conveys the right "to participate in subsequent wells on an additional 700 acres (approximately) to be designated by Nico ...," it does not state that James has the right to participate in all wells drilled in the nonflood-plain area, which was the essence of the fraud claim. Nor do James' pleadings allege that Nico represented to James that he would have the option to participate in all subsequent wells
 
 
 [6]
 18 U.S.C. Sec. 1962(a) provides that it is unlawful for any person who has received income derived from a pattern of racketeering activity to use or invest such income in the operation of an interstate enterprise
 The relevant portion of 18 U.S.C. Sec. 1962(c) provides that it is unlawful to conduct the business affairs of an interstate enterprise through a pattern of racketeering activity. 18 U.S.C. Sec. 1962(d) simply makes it unlawful to conspire to violate section 1962(a), (b), or (c).
 
 
 [7]
 James also asserts that the trial court abused its discretion by denying him leave to file a third amended complaint shortly before the commencement of the trial in this action. Since James maintains that no new claims or theories of recovery were added in the amended complaint, a denial of James' third amended complaint could not possibly prejudice his case. Thus, noting that the "decision to grant leave to amend rests in the sound discretion of the trial court," we hold that no abuse of discretion by the district court exists. Gulf Oil Trading Co. v. M/V Caribe Mar, 757 F.2d 743, 751 (5th Cir.1985)
 Finally, James maintains that the district court erred in refusing to admit a summary chart under Fed.R.Evid. 1006. Refusal to admit summary charts into evidence at the close of the trial is certainly within the broad discretion of the trial court. See, e.g., United States v. Stephens, 779 F.2d 232, 239 (5th Cir.1985).