BOUDIN, Circuit Judge.
This case began with a lawsuit by two Stoughton, Massachusetts, police officers alleging that town officials and two officers who served as chiefs of police of the town retaliated against the plaintiff officers for cooperating with an investigation into police misconduct and for disclosing a hostile *28 work environment at the police department. Following grants of summary judgment and directed verdicts by the district court, and a jury verdict on several remaining claims against one of the defendants, the defendants prevailed on each and every claim. The plaintiff officers now appeal.
Stoughton (“the Town”) is governed by a board of selectmen (“the Board”) that appoints both the town manager and the chief of police. In June 2004, the then board members, by'a divided vote, failed to reappoint the then chief of police, Manuel Cachopa. David Chamberlin, until then serving as one of several police lieutenants, had earlier submitted his retirement papers effective in July 2004, but he agreed at the Board’s request to serve as interim chief and withdrew his retirement application. He held the interim chief position until the Board hired a replacement chief, Joseph Saccardo, in October 2004 and then reverted to his lieutenant position.
In July 2004, Chamberlin learned of allegations that several police officers, including Cachopa, had engaged in criminal misconduct. Chamberlin informed the Norfolk County District Attorney, who appointed a special prosecutor in August. During this period Chamberlin met several times with the district attorney and the special prosecutor, joined on one occasion by a lieutenant, Francis Wohlgemuth. In October, at the special prosecutor’s request, a number of officers were placed on leave, including Cachopa. A grand jury began to inquire into the matter and both Chamberlin and Wohlgemuth testified before the grand jury in late 2004.
After Cachopa was denied reappointment, a recall campaign was begun to remove the board members who had opposed him. In the town election held in November 2004, those members were replaced by two new selectmen, Richard Levine and John Kowalczyk. In mid-November, the new board ordered the suspended officers reinstated and then reappointed Cachopa as chief on November 24. On his return Cachopa immediately made Christopher Ciampa, a sergeant and strong supporter of Cachopa, his effective deputy, promoting him over the heads of the serving lieutenants. In March 2005, Cachopa and two other officers were indicted, and the Board then made Ciampa acting police chief.
In September 2006, Chamberlin and Wohlgemuth filed suit in federal district court against the Town, the Board, Cachopa, Ciampa, and three selectmen (who also had supported Cachopa): Levine, Kowalczyk and Scott Carrara. The gist of the complaint was that Cachopa and Ciampa, aided by the Board, had carried on in 2004 and 2005 a systematic campaign of retaliatory harassment against Chamberlin, Wohlgemuth and other officers who had either opposed Cachopa or remained neutral in the recall campaign. One of those other officers, Sergeant Robert Welch, brought his own suit against Cachopa, Ciampa and other defendants. See Welch v. Ciampa, 542 F.3d 927 (1st Cir.2008) (reversing and remanding in part the dismissal of his claims).
Some of the actions alleged by Chamberlin and Wohlgemuth were petty but a few were more serious; collectively, they arguably alleged enough harm to constitute a viable claim — assuming that the actions were taken for a purpose unlawful under federal or state law. They included inconvenient changes of office and shift for the two plaintiffs, depriving Wohlgemuth of access to many offices in the station, unjustified reprimands, imposing limitations on the plaintiffs’ preexisting authority, requiring them to wear blue shirts instead of senior officer white and inflicting *29 inappropriate medical and other examinations on Chamberlin.
The connection of the defendants other than Cachopa and Ciampa with these events was left obscure in the complaint save for one episode involving other town officials. In January 2005, the Town threatened to sue Chamberlin if he neither retired nor returned retirement incentive pay (allegedly totaling $21,000) which he had received after he initially agreed to retire. The Town did in fact bring such a suit, abandoning it when Chamberlin — out on vacation and then sick leave since November 2004 — retired at the end of March 2005.
The complaint alleged that the claimed harassment was retribution for a set of specific actions by Chamberlin and Wohlgemuth comprising speech assertedly protected under federal or state law or both, specifically: (1) requesting in July 2004 that the town manager investigate the operation of the department, including unequal discipline for those supporting and opposing Cachopa; (2) cooperating with the special prosecutor and grand jury in fall and winter 2004; and (3) advising the town manager by letters of a hostile work environment at the police department in December 2004.
Several different statutes were invoked — the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185(b) (2009), the Massachusetts Civil Rights Act, id. ch. 12, § 111, and the federal civil rights statute, 42 U.S.C. § 1983 (2006), based on the First Amendment — together with a charge of abuse of process relating to the Town’s lawsuit. In addition to this final common law claim, each of three categories of protected speech was made the subject of several different statutory claims and each was stated separately for each plaintiff — resulting in 17 counts. Different defendants appeared in the various counts.
Thereafter the case was narrowed in steps beginning with the district court’s dismissal of the Board. Early on, the Board was dismissed on the ground that it was not subject to suit under the Whistle-blower Statute or § 1983 and, although the district court’s order does not explain why, dismissal of the Massachusetts Civil Rights Act claim against the Board was also granted; plaintiffs make no mention of this lack of explanation on their present appeal so we need not pursue that issue.
On November 27, 2007, the court granted summary judgment for the defendants on a number of counts, qualifying the order a week later. The remaining claims, then set for trial, were a single count under the Massachusetts Civil Rights Act — Wohlgemuth’s claim against Cachopa based on his hostile work environment letter to the town manager — the Whistle-blower statute claims of both plaintiffs against the Town, and their § 1983 claims based on their hostile work environment letters and of Chamberlin based on his grand jury testimony and cooperation with the special prosecutor.
In the first trial, a mistrial was declared as to all claims against Cachopa after plaintiffs’ counsel improperly referred to Cachopa’s indictment. Then at the close of the plaintiffs’ case, the district court, acting from the bench, granted defendants’ oral motions for a directed verdict as to all claims against the remaining defendants. Asked to explain the basis for the directed verdict, the district court invoked (with one exception) “all the reasons argued by the defense counsel and as expressed in their brief’ — a category containing a number of disparate contentions.[1] The district *30 court denied the plaintiffs’ motion for reconsideration and motion for a new trial.
A second trial then ensued on the remaining claims against Cachopa- — plaintiffs’ § 1983 claims based on the December hostile work environment letters, Wohlgemuth’s Massachusetts Civil Rights Act claim based on his letter, and Chamberlin’s § 1983 claim based on cooperation with the special prosecutor and grand jury— and the jury found in Cachopa’s favor on all of the claims. Before us now are appeals relating to the summary judgment and the district court’s rulings in both trials. Denial of a separate new trial motion in the second trial was appealed too late and is not before us.
Plaintiffs’ joint principal brief asserts that the district court erred first by entering summary judgment on specified claims prior to the first trial and directing verdicts in that trial and second by making a series of errors in the course of the second trial. Our review of the directed verdicts is de novo, Ahern v. Scholz, 85 F.3d 774, 793 (1st Cir.1996); review as to alleged trial errors depends upon the character and context of the ruling, e.g., McDonough v. City of Quincy, 452 F.3d 8, 19 (1st Cir.2006) (exclusion of evidence reviewed for abuse of discretion); O’Rourke v. City of Providence, 235 F.3d 713, 736 (1st Cir.2001) (jury instructions reviewed for plain error where party has not timely objected).
The most far-reaching of the issues centers around First Amendment protection vel non for plaintiffs’ statements, and two sets of claims that depend on that premise: the § 1983 claims and the parallel claims under the Massachusetts Civil Rights Act (which the parties treat as subject to the same analysis, Hosford v. Sch. Comm. of Sandwich, 421 Mass. 708, 659 N.E.2d 1178, 1180 n. 5 (1996)). To make out a free speech claim under § 1983, the plaintiffs “must show that [they] engaged in constitutionally protected conduct and that this conduct was a substantial or motivating factor in the alleged adverse employment action.” Welch, 542 F.3d at 936.
First Amendment claims of this kind have been conventional since the Supreme Court developed such a cause of action in the 1960s,[2] and police officers who voice concerns about misconduct and suffer for it have been plaintiffs in a number of such cases. See, e.g., Tripp v. Cole, 425 F.3d 5 (1st Cir.2005); Wagner v. City of Holyoke, 404 F.3d 504 (1st Cir.), cert. denied, 546 U.S. 977, 126 S.Ct. 552, 163 L.Ed.2d 461 (2005) ; Bennett v. City of Holyoke, 362 F.3d 1 (1st Cir.2004); Dirrane v. Brookline Police Dep’t, 315 F.3d 65 (1st Cir.2002). It is unclear how far such claims can survive the Supreme Court’s recent decision in Garcetti v. Ceballos, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) , which ruled that “when public employees make statements pursuant to their official duties, the employees are not *31 speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.”
Virtually all of the “protected conduct” relied on by the plaintiffs was speech-related activity that arguably was done “pursuant to their official duties”; but it is unclear how far the Supreme Court intends to carry Garcetti, and the Massachusetts Whistleblower Statute offers quite similar protection unaffected by Garcetti,[3] Although the First Amendment (implemented through § 1983 or the Massachusetts Civil Rights Act) differs from the Whistleblower Statute in many incidents, the core difficulty in this case is common to both: the difficulty of proving that Cachopa and Ciampa took various of their actions in order to retaliate for protected activity.
The Stoughton Police Department was surely in turmoil in the 2004-2005 period. In a relatively brief window, the chief position was held by Cachopa, Chamberlin, Saceardo, Cachopa again and then Ciampa who was closely allied with Cachopa. Cachopa was himself ultimately convicted in 2009 of being an accessory after the fact to more serious misconduct of which another officer (Sergeant David Cohen) was convicted.[4] Officers who had not supported Cachopa or the recall campaign, including Chamberlin and Wohlgemuth, seem to have been subject to harassment after Cachopa regained authority and during Ciampa’s tenure.
But it remained the plaintiffs’ task to establish that Cachopa, Ciampa or both took adverse action against one or both of the plaintiffs motivated at least in part by their protected conduct, and in this respect the plaintiffs’ case rested primarily on soft inference as against flat denials by both the defendant officers. In particular, plaintiffs had no direct proof that either of the two defendant officers knew that Chamberlin had instigated the special prosecutor’s inquiry or that either plaintiff had testified to the grand jury, and both defendants denied knowing about who testified before the grand jury.
Further, certain of the small administrative steps complained of by the plaintiffs could be taken as hostile or defended as consistent with regulations, so it is not easy to work backwards and conclusively infer a malign motive from the acts themselves. Other problems included the uncertainty as to significant compensable harm, lack of medical evidence of emotional harm, and the fact that Chamberlin was on leave during most of the events. This, then, looks like a suitable case for a jury to sort out cause, motive and effect; and when the jury got the claims against Cachopa, it rejected them on the merits.
It is true that the district court let the case against Cachopa go to the jury in the second trial while it directed a verdict in *32 Ciampa’s favor in the first. But Cachopa was the chief when the principal incidents occurred; Ciampa was his creature as his effective deputy promoted to that spot over the heads of the lieutenants; and the most plausible case against both rested on the notion that they were cooperating to inflict petty misery on the plaintiffs, one of whom had supplanted Cachopa and the other of whom had failed to support him.
The jury in the second trial was allowed to consider practically all of the claimed acts of retaliation. A number of these acts were done by Cachopa directly (changing the plaintiffs’ shift and shirt colors; appointing Ciampa as executive officer over the heads of the lieutenants and reducing the plaintiffs’ responsibilities; sending Chamberlin letters demanding doctor’s notes). Others were, by Cachopa’s own admission, done at his direction by his deputy, Ciampa (moving Chamberlin and Wohlgemuth to a different office; imposing various restrictions on Chamberlin for not requalifying with his firearm). A few acts were presented to the jury without clear evidence as to whether Cachopa or Ciampa was the primary actor (changing plaintiffs’ training locations).
In other words, for almost all the acts of alleged retaliation, Cachopa was either the principal actor or at least as culpable as Ciampa. Nonetheless, the jury found that Cachopa did not retaliate against the plaintiffs for protected conduct. The jury’s determination that Cachopa was not liable “fatally eviscerated” the plaintiffs’ claims against Ciampa and the defendants from the Town. Earle v. Benoit, 850 F.2d 836, 845 (1st Cir.1988).[5] Earle is not conclusive — the fatal determination there was in the same trial — but the principle is the same, namely, that courts do not have further proceedings based on harmless errors.
Appellate review after the grant of a directed verdict usually involves a measure of speculation about how the jury would have decided if a directed verdict had been denied; but no speculation is needed here because the same claims were effectively tried and lost in the second case. This is a rare occurrence and perhaps without precedent; but that should hardly prevent us from exercising common sense. Yes, the Seventh Amendment provides for jury trials; but, directed verdicts and harmless error are established qualifications (so too are waiver, stipulation and estoppel). Whether the case against Ciampa was fairly tested by the second trial is a separate question.
A few alleged retaliatory acts — for which Ciampa and the Town were the primary actors — were not squarely presented to the jury in the second trial. After Ciampa became acting chief, he directed Chamberlin to undergo a medical examination to determine his fitness to return to duty; issued warnings to Wohlgemuth for comments made to other officers; and sent Wohlgemuth a letter about sick time abuse. These incidents not only fail as a retaliation claim, cf. Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218 (1st Cir.1989) (en banc), but add no real weight to the more serious incidents that occurred while Cachopa was chief.
Thus, the medical examination was required for officers out of work for five days *33 or more due to off-duty injury or illness, and the dispute centered around a possible conflict of the policy with the union contract; Wohlgemuth did not seriously deny making some negative comments about other officers; and whether he marginally exceeded his sick time is unclear even after reading relevant testimony. By contrast, the list of alleged wrongful acts occurring while Cachopa was chief is far longer and included at least a few of some substance.[6] This is presumably why the court did not direct a verdict for Cachopa; even so, Cachopa prevailed.
As for the Town, it was within its rights in filing suit against Chamberlin over his retirement incentive. Chamberlin did not retire as promised for whatever reason, and the Board could legitimately seek to enforce the agreement; engaging in protected conduct did not insulate Chamberlin from these consequences. See Blackie v. Maine, 75 F.Sd 716, 723-24 (1st Cir.1996). According to Chamberlin’s own testimony, the Board’s desire that he retire predated much of the arguably protected conduct.
Nowhere do plaintiffs explain how they could have prevailed against Ciampa when the jury rejected counterpart claims against Cachopa. Instead, they argue that the second trial was itself flawed: of their twelve claims in this court, eight assert errors in the second trial. Of course, the outcome of the second trial could not insulate defendants if it were itself flawed; but a number of the claims involve trial-court judgment calls about which little need be said and the most important of the challenged rulings — discussed next — do not comprise reversible error.
Most important, plaintiffs argue that the district court erred by excluding a report that the Town commissioned from attorney Marc Terry (the “Terry Report”) in response to the plaintiffs’ letters alleging a hostile work environment. Terry interviewed a number of witnesses regarding the plaintiffs’ allegations and concluded that Cachopa had retaliated against the plaintiffs both for their cooperation with the grand jury investigation and for failing to support Cachopa’s effort to remain as chief.
In excluding the report, the district court stated, “I think given its timing and given the fact that it was requested in July of 2004 and we don’t get it until October of 2005 .... [and] given its level of generality, I think it’s unduly prejudicial.” The reference to timing is unclear to us and the reference to generality is perhaps confusing; the report was fairly detailed as to the underlying events. But in all likelihood the district court meant that the utility of the report to plaintiffs was its final assessment, which their brief underscores, that Cachopa was not credible in his denials as to what he did and why.
Cachopa’s credibility as to what he did and why was central to the second trial, but the underlying evidence of events bearing on that was available to the plaintiffs. To superimpose Terry’s evaluation on what the jury was expected to decide served no useful purpose: it was the jury’s task to decide whether to believe Cachopa. Terry was not qualified or offered as an expert on “credibility”; and to treat his independent judgment as evidence would simply weight one side of the scale to Cachopa’s disadvantage.
*34 It thus does not matter whether Terry’s report avoids a hearsay objection by virtue of Rule 803(8)(c) or otherwise;[7] Rule 403 independently permits exclusion of evidence that is unduly prejudicial and to exclude the report on this ground was not an abuse of discretion. This would be a different case if plaintiffs were pointing us to raw facts that Terry had uncovered and for which evidence was not readily available to plaintiffs themselves.
The plaintiffs also argue that the district court erred by refusing to allow them to examine Cachopa over his role in the initial investigation of Cohen, whose conduct was the subject of the later inquiry by the special prosecutor and grand jury investigation. The plaintiffs claim that Cachopa opened the door to the issue by testifying that he himself had brought the matter before the district attorney in 2003, and that they were denied the chance to demonstrate fully Cachopa’s misconduct in this matter.
However, the transcript indicates that the district court did not flatly bar the plaintiffs from examining Cachopa on the Cohen investigation. Rather, Cachopa was the first witness to testify in the case, and the district court seemingly believed that the jury should first be apprised of any wrongs that Cachopa did to the plaintiffs before digressions into Cachopa’s role in the Cohen matter. The court ruled that “[y]ou better go to something that’s relevant and then you can come back to this. You can come back to it ... if it’s relevant.” The plaintiffs tried again several questions later, in response to which the court sustained an objection “without prejudice to your returning to it.”
So far as appears, the plaintiffs made no effort to question Cachopa on the Cohen matter again. The Cohen matter, and Cachopa’s conduct in relation to it, was arguably “relevant” under Rule 401 of the Federal Rules of Evidence — for example, because it bore on his motivation to retaliate against Chamberlin for prompting an inquiry into the matter. But the district court “enjoy[s] wide latitude in matters concerning the ordering of proof and the presentation of evidence,” Morales Feliciano v. Rullan, 378 F.3d 42, 57 (1st Cir.2004), cert. denied, 543 U.S. 1054, 125 S.Ct. 910, 160 L.Ed.2d 776 (2005), and plaintiffs were free to return to the Cohen matter after they adduced evidence that Cachopa had taken steps against the plaintiffs for which his motive was relevant.
The plaintiffs next argue that the district court erred by instructing the jury to determine whether the plaintiffs’ December 7 letters alleging a hostile work environment were protected conduct under the “matters of public concern” and interest-balancing tests used by the Supreme Court, at least prior to the exception now carved out by Garcetti. Whether speech is constitutionally protected is ordinarily a matter for the judge, not the jury;[8] but the plaintiffs did not object to this aspect *35 of the jury instructions and so the objection is waived, absent plain error — a stiff test in civil cases, see Diaz-Seijo v. Fajardo-Velez, 397 F.3d 53, 56 (1st Cir.2005), which plaintiffs do not meet.
The plaintiffs also challenge the district court’s failure to instruct the jury that the plaintiffs’ cooperation with the special prosecutor was protected under the First Amendment. As two senior officers in the police department, it was within the scope of both plaintiffs’ duties to cooperate with the district attorney and the special prosecutor in investigating alleged criminal activity within the police department. Wohlgemuth shared responsibility for internal investigations, and Chamberlin had launched the investigation as part of his duties as chief. The district court correctly ruled that this conduct was not protected by the First Amendment under Garcetti
We are not suggesting that Garcetti applies every time a police officer has conversations with a prosecutor. What constitutes official duties will necessarily vary with the circumstances including the rank of the officer, his areas of responsibility and the nature of the conversations; but in this case the facts just summarized are sufficient. The district court also instructed the jury that cooperation with the grand jury was protected speech; but this instruction, being favorable to plaintiffs, is not before us and need not be addressed.
The district court also told the jury that the plaintiffs presented “no medical testimony” that distinguished emotional distress based on “protected speech from tile other divisiveness in the department,” and “you need such testimony.” No per se rule requires expert testimony for an award of compensatory damages based on emotional distress, e.g., McDonough, 452 F.3d at 22, but if there was error, it was harmless. The jury was told to award at least nominal damages if a protected speech violation occurred and did not do so — so the predicate for any damages was absent.
The remaining claims of trial error require no detailed discussion. The plaintiffs are wrong that the district court precluded proof of the shift changes and shirt color issue pressed by plaintiffs; the district court’s restrictions on time allowed to each side were within the district court’s authority; and a complained of comment by the district court — itself somewhat opaque — is not a basis for a new trial.
The judgment is affirmed. Each side shall bear its own costs on this appeal.

It is so ordered.

. Those grounds included a lack of compensable damages, coupled with a lack of evil mo *30 tive or intent sufficient to award punitive damages; the fact that many of the alleged retaliatory acts took place prior to the December hostile work environment letters; a lack ,pf knowledge by the defendants of the plaintiffs’ grand jury testimony; a lack of retaliatory acts by the Selectmen or Ciampa; and a lack of a policy or custom of retaliation by the Town. The district court said, however, that it did not adopt in full the defendants’ reading of current First Amendment doctrine.

. See, e.g., Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

. The Whistleblower Statute imposes liability on the state, local towns, and other public entities that retaliate against an employee through “adverse employment action” for specified conduct, Mass. Gen. Laws ch. 149, § 185(a), (b); and the protected conduct, subject to certain conditions, includes — to paraphrase two of the subsections that follow: (1) disclosing to a supervisor or "public body” activity by the employer that the complaining employee believes to be unlawful or dangerous; and (2) providing information or testimony to a "public body” conducting an investigation into unlawful conduct or a threat to safety. Id. ch. 149, § 185(b).

. The Massachusetts Supreme Judicial Court later reversed Cohen’s conviction and remanded the case for a new trial, on the grounds that the trial court had violated Cohen's right to a public trial by restricting access to the courtroom during jury selection. Commonwealth v. Cohen, 455 Mass. 600, 919 N.E.2d 628 (2010).

. Earle is far from the only example. See, e.g., Goulet v. New Penn Motor Express, Inc., 512 F.3d 34, 43 (1st Cir.2008); Senra v. Cunningham, 9 F.3d 168, 174 (1st Cir.1993); Dixon v. City of Lawton, 898 F.2d 1443, 1449 (10th Cir.1990); James v. Nico Energy Corp., 838 F.2d 1365, 1373 (5th Cir.1988); Mello v. K-Mart Corp., 792 F.2d 1228, 1231 (1st Cir.1986); Juneau Square Corp. v. First Wisconsin Nat’l Bank, 624 F.2d 798, 814 n. 17 (7th Cir.1980); Janich Bros., Inc. v. American Distilling Co., 570 F.2d 848, 855 (9th Cir.1977).

. The ones of some arguable substance included Cachopa’s altering of Chamberlin and Wohlgemuth shifts; Cachopa’s appointment of Ciampa; and several other actions taken by Ciampa but seemingly at Cachopa's direction: a requirement that Chamberlin requalify to carry firearms and confinement to station until this occurred; a reduction in Wohlgemuth’s duties; and an official reprimand in Chamberlin’s personnel file.

. Federal Rule of Evidence 803(8)(c) creates a hearsay exception for reports of "public offices or agencies, setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The plaintiffs also cite Rule 801(d)(2)(C), which covers statements by authorized persons, and Rule 801(d)(2)(D), which covers statements by agents.

. Connick, 461 U.S. at 148 n. 7, 103 S.Ct. 1684 (“The inquiry into the protected status of speech is one of law, not fact.”); Curran v. Cousins, 509 F.3d 36, 45 (1st Cir.2007) ("[I]t is the judge who decides as a matter of law the issues in the two steps Garcetti identifies.”); Lewis v. City of Boston, 321 F.3d 207, 219 (1st Cir.2003).