JOYCE T. HOSFORD vs. SCHOOL COMMITTEE OF SANDWICH
                        & another.[1]

            Barnstable. December 5, 1995. - January 18, 1996.

    Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, GREANEY, & FRIED, JJ.

*Constitutional Law*, Education, Freedom of speech and press. *School and
    School Committee*, Termination of employment.

Discussion of a teacher's right to academic freedom as raising a free
    speech claim under the First Amendment to the Constitution of the
    United States [712-713] and discussion of cases considering expression
    in the academic context [713-714].
The decision of a superintendent of schools to discipline a teacher and then
    to take unfavorable personnel action against her for a class discussion
    she had led regarding the meaning and use of certain vulgar terms vio-
    lated the teacher's right to freedom of expression under the First
    Amendment to the Constitution of the United States, where, in the con-
    text of the discussion, the treatment of the subject was appropriate,
    where there was no school policy banning the articulation of such words
    from the classroom altogether, and where written policy did require the
    teacher particularly to use her judgment in situations that might other-
    wise have called for disciplinary action against the students. [714-717]
On remand of an action brought by a school teacher alleging violation of
    her rights under the First Amendment to the Constitution of the United
    States for discipline and unfavorable personnel action against her for
    leading a classroom discussion regarding the meaning and use of cer-
    tain vulgar terms, judgment was to enter for the plaintiff and damages
    were to be determined. [717-718]


    CIVIL ACTION commenced in the Superior Court Depart-
ment on November 20, 1989.
    The case was heard by *Elizabeth J. Dolan*, J., and *George
C. Keady, Jr.*, J., on motions for summary judgment.

---

[1]Joseph F. Nicholson, individually and as superintendent of schools of
Sandwich.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Americo A. Salini, Jr.,* for the plaintiff.

*Joseph A. Emerson, Jr.,* for the defendants.

FRIED, J. Joyce T. Hosford, an untenured special needs teacher employed by the school committee of Sandwich (school committee), was suspended for two days and, at the end of the school year, was not reemployed because of an incident at the end of one of her classes. The superintendent of schools of Sandwich, Dr. Joseph F. Nicholson, considered that the incident showed poor judgment on Hosford's part. Hosford claims that her conduct during that brief portion of the class was pedagogically appropriate and consistent with the stated policies and guidelines of the school. On November 20, 1989, she brought suit in the Superior Court against the school committee and Nicholson seeking reinstatement and back pay on the ground that the suspension and failure to reappoint violated rights guaranteed to her by the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments.[2] The Superior Court judge granted defendants' motion for summary judgment. We transferred the case to this court on our own motion, and now reverse.

## I

The following facts are undisputed. Hosford had been employed during the 1987-1988 and 1988-1989 school years as a speech and language pathologist in the special needs department of the Sandwich public schools, meeting with students in small therapy sessions to assist them in improving their written and oral expression. On March 21, 1989, Hosford was conducting a regularly scheduled session at Sandwich Junior High School with three thirteen year old, male, seventh grade, special needs students. She had been working

[2]Hosford's complaint contains three counts. Hosford has only appealed from the Superior Court's judgment as to count one (art. 16 of the Massachusetts Declaration of Rights, as amended) and count three (42 U.S.C. § 1983 [1988], alleging a violation of her First Amendment rights).

with each of these students for at least one and one-half years. One of the subjects under discussion on this afternoon was words with multiple meanings. One of the students had been a disruptive element in the class for some time, often audibly muttering "the f word" under his breath. On this occasion, he interrupted the discussion by mentioning "the 'f' word and the words that we do not use in class" as examples of words with multiple meanings. There were about ten minutes remaining in the period, and Hosford decided that rather than ignore this student, as she had in the past, she would confront the issue by asking him "What do you mean by the words we don't use in class and the 'F' word?" The student answered, "Fuck." Hosford continued the exchange by asking, "What does that mean?" One of the other students volunteered, "Sexual intercourse." Hosford then explained how the colloquial uses of that word often made no sense in terms of its literal meaning. A student then brought up the word "shit," and Hosford once again asked for the literal meaning of the word. The student used the word in a sentence that correctly invoked that literal meaning. Hosford then said that "[g]rammatically that is correct. However, I suggest you not use it in school or at home."

It is clear, therefore, that Hosford was responding to a student's obviously provocative and somewhat disruptive interjections. During oral argument to this court counsel for the defendants stated that they had no objection to this interchange.[3] The difficulty begins at what happened in the remaining few minutes of the class. Hosford asked if there were any other questions, at which point the students brought up the words "bitch," "slut," "blow job," and "prick." Hosford either gave or elicited from the students a

---

[3]It is not clear whether this concession related to both students' interjections or only the first, but in light of the defendants' argument it would be captious to draw the line at the first and quarrel about the second brief interchange. As is evident from the balance of this opinion, we would have certainly reached our conclusion with or without this concession and, by offering it, counsel not only discharged a duty of candor to this court, but also put the defendants' claim in its most reasonable aspect.

literal definition of each of these words, saying that, if the students were going to use them, they should have in mind these literal meanings. Then she closed off the discussion, saying, "This is the end of the discussion of these words. If you have any questions please ask an adult or use the unabridged dictionary in the library. I don't want any more time taken up with these."

That evening a parent of one of the students in the class told Hosford that a parent of another student in that class was very upset about the class discussion, and the next day Hosford was told to come to the principal's office to discuss what had happened in that class. There she met with Nicholson, John Pierce, the school's principal, Brian Davis, director of special education, and Gilbert Newton, president of the Sandwich Education Association. Hosford acknowledged that the discussion had taken place, that she had continued the discussion by inviting the students to ask about the words, that she had done so to prevent disruption of the class, and that the answers she had given the students were the same as she would have given her own children.[4] Nicholson expressed concern about Hosford's judgment in permitting that kind of discussion. In a letter dated March 27, 1989, Nicholson notified Hosford that he was suspending her without pay for two days. The letter stated: "[Y]ou have engaged in similar frank and open discussion about sexual topics with your own children and wished to treat our high school children in the same manner. Such a discussion however is the perogative [sic] of a parent but is not a shared prerogative [sic] with the classroom teacher."

In April, 1989, Nicholson told Hosford he would not recommend her for reappointment for the next school year but would advertise the post and hire from the open market, where he thought he could "do better." Accordingly, she was not reappointed and, on November 20, 1989, Hosford

---

[4]There is no evidence or allegation that any similar incident had taken place in the past or took place again thereafter.

brought this action against the school committee and Nicholson.

## II

## A

Hosford invokes a teacher's right to academic freedom as part of her claim under the First Amendment and the Declaration of Rights. She is correct that a number of courts have invoked this concept, and it has appeared in opinions in the Supreme Court of the United States. See *Regents of the Univ. of Cal.* v. *Bakke*, 438 U.S. 265, 312 (1978); *Keyishian* v. *Regents of the Univ. of N.Y.*, 385 U.S. 589, 603 (1967); *Wieman* v. *Updegraff*, 344 U.S. 183, 194-198 (1952) (Frankfurter, J., concurring). See also *Mailloux* v. *Kiley*, 323 F. Supp. 1387, 1390 (D. Mass.), aff'd, 448 F.2d 1242 (1st Cir. 1971). It would not assist analysis to posit a new, distinct right of academic freedom either under our own or the Federal Constitution.[5] Rather, both principle and precedent (not to mention the constitutional texts) lead us to analyze academic freedom cases as raising free speech claims, though in a distinct set of contexts and therefore implicating a distinct set of rules.

Academic freedom cases are not like *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980), and its progeny, where the Supreme Court posited "unarticulated rights," *id.* at 579, "implicit in the guarantees of the First Amendment," *id.* at 580, rather than rely on the Amendment itself, because the Court may have been reluctant to recognize a general First Amendment right of access to information regarding matters of public concern. *Id.* at 564-575 (emphasizing that the right "pervades the centuries-old history of open trials and the opinions of this Court"). Nor are academic freedom cases analogous to *NAACP* v. *Alabama*, 357 U.S. 449 (1958), which recognized a distinct freedom of association,

---

[5]Our State freedom of speech analysis is guided by the Federal analysis. See *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 558 (1979). Because we find that Hosford's First Amendment rights were violated, we need not distinguish between the State and Federal analyses.

because neither the right to free speech nor the right peaceably to assemble could readily stretch to cover that territory. In this case, as in *Mailloux, supra*; *Ward* v. *Hickey*, 996 F.2d 448 (1st Cir. 1993); and *Wieman, supra*, what is in issue is quite straightforwardly an attempt by government officers to punish a person for what that person has said, and this squarely implicates the First Amendment.

### B

While expression in the academic context fully implicates free speech concerns, it has been recognized in numerous cases that that context may also authorize regulations that would not be accepted absent that special context. Thus, the Supreme Court in *Bethel Sch. Dist. No. 403* v. *Fraser*, 478 U.S. 675 (1986), allowed the three-day suspension of a student who delivered a sexually suggestive speech at a high school assembly. Accord *Hazelwood Sch. Dist.* v. *Kuhlmeier*, 484 U.S. 260 (1988). Compare *Rosenfeld* v. *New Jersey*, 408 U.S. 901 (1972) (vacating conviction of a participant in a public meeting for using gross and insulting obscenities). Even in *Tinker* v. *Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 507 (1969), and *Board of Educ., Island Trees Union Free Sch. Dist. No. 26* v. *Pico*, 457 U.S. 853, 863-864 (1982), which represent the high water mark of the Supreme Court's recognition of free speech rights in school settings, the Court was careful to acknowledge a broad, general discretion in public authorities to regulate the content, manner, and ambience in which education takes place. That discretion extends to decisions about initial hiring and about the retention of untenured teachers, and school authorities are fully entitled to consider intangible and subjective factors like a teacher's actual or predicted relation to her students, colleagues, parents, and the school authorities.

What those authorities may not do is act on the basis of factors that the State and Federal Constitutions and laws have declared relate to protected rights of actual and potential public employees. Obviously the school authorities may not make hiring or retention decisions that discriminate on

the basis of race, religion, or national origin. Nor may such decisions be made on the basis of a teacher's or prospective teacher's political affiliation or support. Cf. *Rutan* v. *Republican Party of Ill.*, 497 U.S. 62 (1990). The same conclusion holds where the unfavorable decision is based on a right protected by statute. *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Comm'n*, 386 Mass. 414 (1982) (failure to reappoint untenured teacher because of union activity). And where constitutionally protected conduct has been shown to have been a motivating factor of an unfavorable hiring decision, the plaintiff is entitled to relief unless the defendant can show that the unfavorable decision would have been taken anyway on the basis of factors that are not constitutionally or statutorily protected. *Mt. Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 286-287 (1977). Accord *Southern Worcester County Regional Vocational Sch. Dist., supra* at 418-419.

In this case, there is no substantial dispute that the only reason Hosford was not rehired was because of her invitation to her three students in the last few minutes of her March 21, 1989, class to propose other terms for analysis similar to the analysis which had been accorded to the first one or two words in that ten-minute period. The initial treatment of the subject was entirely appropriate. No other reason for failing to rehire Hosford was given. She had been evaluated as a "no nonsense teacher" and the principal of the school had never expressed concerns about her performance. Finally, there was deposition testimony that Superintendent Nicholson had told another administrator that her use of the vulgar terms was the reason for his decision not to reappoint her.

## C

Thus the case comes down to the single issue whether the decision first to discipline and then to take an unfavorable personnel action against Hosford because of that one brief class segment violated her constitutional rights. We are cer-

tain it did.[6] The distinction between what the defendants concede was pedagogically valid at the beginning of that brief segment and the continuation of that same discussion for a few minutes more, which somehow provoked the superintendent's disapproval and led him and the judge below to conclude that at that point Hosford had lost control of the class, is so insubstantial as to justify characterizing it as arbitrary and capricious.[7] That the superintendent's action against Hosford fails this most basic and minimal test does not mean that it does not also violate Hosford's free speech rights. Hosford was disciplined and not rehired because of the class discussion she held in those last few minutes of her class, and that discussion was speech.

Common sense compels the conclusion that there was nothing amiss about that discussion. The contention that these are words that would surprise or offend the delicate ears of thirteen year old boys is unconvincing, the more so since it was the boys themselves who brought them up. Nor is there the slightest basis for the suggestion that Hosford had continued the discussion to titillate or provoke the boys. Hosford was quite stern about admonishing the students not to use these terms in class, to use them sparingly if at all, and not to ask other students about the meanings of such words. This was, after all, a small class of students identified as having difficulties in the use of language, and such a strat-

---

[6]As the Supreme Court said in *Bose Corp.* v. *Consumers Union of the U.S., Inc.,* 466 U.S. 485, 499 (1984), quoting *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 284-286 (1964), "in cases raising First Amendment issues [the Court] has repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'"

[7]As we have explained above, the failure to rehire an untenured teacher is subject to review if substantive constitutional rights such as those protected by the First Amendment or statutory rights, see *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Comm'n,* 386 Mass. 414 (1982), have been violated. We need not consider whether, even absent such a violation, Hosford would be entitled to relief for her two-day suspension on no greater showing than that it was arbitrary and capricious.

egy to trap and perhaps shame them into more reasonable linguistic behavior might have seemed particularly eligible at that point in that class.

But even these considerations might yield to a school policy to ban any articulation of such words from the classroom altogether. If there had been such a policy, we might conclude that Hosford was bound to respect it on pain of the very consequences that were visited upon her here. See *Mailloux, supra* at 1391 n.4; *Ward* v. *Hickey,* 996 F.2d 448, 453 (1st Cir. 1993). To assist their argument on this ground, the defendants direct our attention to the Sandwich Junior High School handbook, which is supplied to all teachers at the school. Paragraph 18, captioned "Use of Language," provides:

> "The use of profane or abusive language or gestures (including racial, religious, ethnic, or sexual slurs) have no place in school and will not be tolerated. Violations will result in detention and/or suspension."

The reference to this rule is not sufficient to make the defendants' point. Hosford did not tolerate the use of the vulgarities that she made the subject of the last few minutes of her class. On the contrary, she claims, and we think plausibly, that the discussion she led was designed precisely to bring out into the open the reasons why such language is immature and inappropriate. And she also stated explicitly what lesson the students were to draw from the discussion, admonishing them not to use these words in class or at home and not to turn the lessons of the class into a game where they would ask their classmates for definitions of vulgar words.

A final reason supporting Hosford's judgment to proceed as she did in the face of this issue is supplied by a provision of the "Special Needs — Discipline Guidelines."

> "As specialists, resource room teachers are expected [*sic*] to address the individual needs of students assigned to your classroom. Frequently these 'needs' are

behaviorally related and require some flexibility and creativity on the part of the special needs teaching staff. Therefore it is expected that the skills of the resource room teacher combined with the reduced class size (in comparison to the mainstream teachers) will further enable you to address these behaviors within the confines of the resource room setting. As a direct result, it is anticipated that the resource room teacher would not send students to the [principal's] office for disciplinary action as frequently and for the same offenses as our mainstream colleagues. Without a doubt this creates a situation where you may be 'walking a fine line' between what is and is not manageable."

Thus Hosford, as a special needs teacher, was particularly required to try to work out difficult situations in a creative way, without sending students to the principal's office.

Accordingly, we reverse the judgment of the Superior Court and order that judgment be entered for the plaintiff.

## III

It remains to consider what remedy is appropriate on entry of such a judgment. Hosford was an untenured teacher in the second year of a three-year probationary term. Even if she had been reappointed for a third year, there is no reason to conclude that she would have been granted tenure at the end of that year, and our decision carries no implication that she is entitled to tenure. Because of the constitutional nature of the wrong she suffered, however, she is entitled to reinstatement to one untenured year's service as well as to any damages she suffered as a result of her suspension and as a result of the school committee's failure to rehire her less mitigation. Cf. *Southern Worcester County Regional Vocational Sch. Dist., supra* at 421-422 (reinstatement permitted where nontenured teacher illegally not reappointed because of union activity). Nor would the combination of reinstatement and damages constitute double recovery. When reinstated she would give full value for the compensation and benefits she

receives during that year. Damages will compensate her for whatever losses she sustained that reasonably may be attributable to her suspension and the denial to her of her position in the 1989-1990 school year. Since the amount of such damages remains to be determined, the case is remanded to the Superior Court for proceedings consistent with this opinion.

*So ordered.*