# United States Court of Appeals
## For the First Circuit

No. 08-1289

DAVID CHAMBERLIN; FRANCIS WOHLGEMUTH,

Plaintiffs, Appellants,

v.

TOWN OF STOUGHTON; SCOTT CARRARA, Individually and as a member of
the Board of Selectmen; RICHARD LEVINE, Individually and as a
member of the Board of Selectmen; JOHN KOWALCZYK, Individually
and as a member of the Board of Selectmen; CHRISTOPHER CIAMPA,

Defendants, Appellees,

———————

BOARD OF SELECTMEN OF THE TOWN OF STOUGHTON; MANUEL CACHOPA,

Defendants.

————————————

No. 08-1529

DAVID CHAMBERLIN; FRANCIS WOHLGEMUTH,

Plaintiffs, Appellants,

v.

BOARD OF SELECTMEN OF THE TOWN OF STOUGHTON; MANUEL CACHOPA,

Defendants, Appellees,

———————

TOWN OF STOUGHTON; SCOTT CARRARA, Individually and as a member of
the Board of Selectmen; RICHARD LEVINE, Individually and as a
member of the Board of Selectmen; JOHN KOWALCZYK, Individually
and as a member of the Board of Selectmen; CHRISTOPHER CIAMPA,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

———————————

Before

Boudin, Gajarsa[*] and Lipez,

Circuit Judges.

———————————

Diane M. Murphy, Joseph M. Mahaney and McLaughlin, Richards, Mahaney, Biller & Woodyshek, LLP on brief for appellants.

Joseph L. Tehan, Jr., Jackie Cowin and Kopelman and Paige, P.C. on brief for defendant, appellee Town of Stoughton.

Gareth W. Notis, Jennifer S. Bunce and Morrison Mahoney LLP on brief for defendants, appellees Scott Carrara, Richard Levine and John Kowalczyk.

Stephen C. Pfaff and Louison, Costello, Condon & Pfaff on brief for defendants, appellees Manuel Cachopa and Christopher Ciampa.

———————————

April 1, 2010

———————————

———————————

[*]Of the Federal Circuit, sitting by designation.

**BOUDIN, <u>Circuit Judge</u>.** This case began with a lawsuit by two Stoughton, Massachusetts, police officers alleging that town officials and two officers who served as chiefs of police of the town retaliated against the plaintiff officers for cooperating with an investigation into police misconduct and for disclosing a hostile work environment at the police department. Following grants of summary judgment and directed verdicts by the district court, and a jury verdict on several remaining claims against one of the defendants, the defendants prevailed on each and every claim. The plaintiff officers now appeal.

Stoughton ("the Town") is governed by a board of selectmen ("the Board") that appoints both the town manager and the chief of police. In June 2004, the then board members, by a divided vote, failed to reappoint the then chief of police, Manuel Cachopa. David Chamberlin, until then serving as one of several police lieutenants, had earlier submitted his retirement papers effective in July 2004, but he agreed at the Board's request to serve as interim chief and withdrew his retirement application. He held the interim chief position until the Board hired a replacement chief, Joseph Saccardo, in October 2004 and then reverted to his lieutenant position.

In July 2004, Chamberlin learned of allegations that several police officers, including Cachopa, had engaged in criminal misconduct. Chamberlin informed the Norfolk County District

Attorney, who appointed a special prosecutor in August. During this period Chamberlin met several times with the district attorney and the special prosecutor, joined on one occasion by a lieutenant, Francis Wohlgemuth. In October, at the special prosecutor's request, a number of officers were placed on leave, including Cachopa. A grand jury began to inquire into the matter and both Chamberlin and Wohlgemuth testified before the grand jury in late 2004.

After Cachopa was denied reappointment, a recall campaign was begun to remove the board members who had opposed him. In the town election held in November 2004, those members were replaced by two new selectmen, Richard Levine and John Kowalczyk. In mid-November, the new board ordered the suspended officers reinstated and then reappointed Cachopa as chief on November 24. On his return Cachopa immediately made Christopher Ciampa, a sergeant and strong supporter of Cachopa, his effective deputy, promoting him over the heads of the serving lieutenants. In March 2005, Cachopa and two other officers were indicted, and the Board then made Ciampa acting police chief.

In September 2006, Chamberlin and Wohlgemuth filed suit in federal district court against the Town, the Board, Cachopa, Ciampa, and three selectmen (who also had supported Cachopa): Levine, Kowalczyk and Scott Carrara. The gist of the complaint was that Cachopa and Ciampa, aided by the Board, had carried on in 2004

and 2005 a systematic campaign of retaliatory harassment against Chamberlin, Wohlgemuth and other officers who had either opposed Cachopa or remained neutral in the recall campaign. One of those other officers, Sergeant Robert Welch, brought his own suit against Cachopa, Ciampa and other defendants. See Welch v. Ciampa, 542 F.3d 927 (1st Cir. 2008) (reversing and remanding in part the dismissal of his claims).

Some of the actions alleged by Chamberlin and Wohlgemuth were petty but a few were more serious; collectively, they arguably alleged enough harm to constitute a viable claim--assuming that the actions were taken for a purpose unlawful under federal or state law. They included inconvenient changes of office and shift for the two plaintiffs, depriving Wohlgemuth of access to many offices in the station, unjustified reprimands, imposing limitations on the plaintiffs' preexisting authority, requiring them to wear blue shirts instead of senior officer white and inflicting inappropriate medical and other examinations on Chamberlin.

The connection of the defendants other than Cachopa and Ciampa with these events was left obscure in the complaint save for one episode involving other town officials. In January 2005, the Town threatened to sue Chamberlin if he neither retired nor returned retirement incentive pay (allegedly totaling $21,000) which he had received after he initially agreed to retire. The Town did in fact bring such a suit, abandoning it when Chamberlin--

out on vacation and then sick leave since November 2004--retired at the end of March 2005.

The complaint alleged that the claimed harassment was retribution for a set of specific actions by Chamberlin and Wohlgemuth comprising speech assertedly protected under federal or state law or both, specifically: (1) requesting in July 2004 that the town manager investigate the operation of the department, including unequal discipline for those supporting and opposing Cachopa; (2) cooperating with the special prosecutor and grand jury in fall and winter 2004; and (3) advising the town manager by letters of a hostile work environment at the police department in December 2004.

Several different statutes were invoked--the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185(b) (2009), the Massachusetts Civil Rights Act, id. ch. 12, § 11I, and the federal civil rights statute, 42 U.S.C. § 1983 (2006), based on the First Amendment--together with a charge of abuse of process relating to the Town's lawsuit. In addition to this final common law claim, each of three categories of protected speech was made the subject of several different statutory claims and each was stated separately for each plaintiff--resulting in 17 counts. Different defendants appeared in the various counts.

Thereafter the case was narrowed in steps beginning with the district court's dismissal of the Board. Early on, the Board

was dismissed on the ground that it was not subject to suit under the Whistleblower Statute or § 1983 and, although the district court's order does not explain why, dismissal of the Massachusetts Civil Rights Act claim against the Board was also granted; plaintiffs make no mention of this lack of explanation on their present appeal so we need not pursue that issue.

On November 27, 2007, the court granted summary judgment for the defendants on a number of counts, qualifying the order a week later. The remaining claims, then set for trial, were a single count under the Massachusetts Civil Rights Act--Wohlgemuth's claim against Cachopa based on his hostile work environment letter to the town manager--the Whistleblower statute claims of both plaintiffs against the Town, and their § 1983 claims based on their hostile work environment letters and of Chamberlin based on his grand jury testimony and cooperation with the special prosecutor.

In the first trial, a mistrial was declared as to all claims against Cachopa after plaintiffs' counsel improperly referred to Cachopa's indictment. Then at the close of the plaintiffs' case, the district court, acting from the bench, granted defendants' oral motions for a directed verdict as to all claims against the remaining defendants. Asked to explain the basis for the directed verdict, the district court invoked (with one exception) "all the reasons argued by the defense counsel and as expressed in their brief"--a category containing a number of

disparate contentions.[1]  The district court denied the plaintiffs' motion for reconsideration and motion for a new trial.

A second trial then ensued on the remaining claims against Cachopa--plaintiffs' § 1983 claims based on the December hostile work environment letters, Wohlgemuth's Massachusetts Civil Rights Act claim based on his letter, and Chamberlin's § 1983 claim based on cooperation with the special prosecutor and grand jury-- and the jury found in Cachopa's favor on all of the claims.  Before us now are appeals relating to the summary judgment and the district court's rulings in both trials.  Denial of a separate new trial motion in the second trial was appealed too late and is not before us.

Plaintiffs' joint principal brief asserts that the district court erred first by entering summary judgment on specified claims prior to the first trial and directing verdicts in that trial and second by making a series of errors in the course of the second trial.  Our review of the directed verdicts is de novo, Ahern v. Scholz, 85 F.3d 774, 793 (1st Cir. 1996); review as to alleged trial errors depends upon the character and context of the

---

[1]Those grounds included a lack of compensable damages, coupled with a lack of evil motive or intent sufficient to award punitive damages; the fact that many of the alleged retaliatory acts took place prior to the December hostile work environment letters; a lack of knowledge by the defendants of the plaintiffs' grand jury testimony; a lack of retaliatory acts by the Selectmen or Ciampa; and a lack of a policy or custom of retaliation by the Town.  The district court said, however, that it did not adopt in full the defendants' reading of current First Amendment doctrine.

-8-

ruling, e.g., McDonough v. City of Quincy, 452 F.3d 8, 19 (1st Cir. 2006) (exclusion of evidence reviewed for abuse of discretion); O'Rourke v. City of Providence, 235 F.3d 713, 736 (1st Cir. 2001) (jury instructions reviewed for plain error where party has not timely objected).

The most far-reaching of the issues centers around First Amendment protection vel non for plaintiffs' statements, and two sets of claims that depend on that premise: the § 1983 claims and the parallel claims under the Massachusetts Civil Rights Act (which the parties treat as subject to the same analysis, Hosford v. Sch. Comm. of Sandwich, 659 N.E.2d 1178, 1180 n.5 (Mass. 1996)). To make out a free speech claim under § 1983, the plaintiffs "must show that [they] engaged in constitutionally protected conduct and that this conduct was a substantial or motivating factor in the alleged adverse employment action." Welch, 542 F.3d at 936.

First Amendment claims of this kind have been conventional since the Supreme Court developed such a cause of action in the 1960s,[2] and police officers who voice concerns about misconduct and suffer for it have been plaintiffs in a number of such cases. See, e.g., Tripp v. Cole, 425 F.3d 5 (1st Cir. 2005); Wagner v. City of Holyoke, 404 F.3d 504 (1st Cir.), cert. denied,

---

[2]See, e.g., Connick v. Myers, 461 U.S. 138 (1983); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977); Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563 (1968).

546 U.S. 977 (2005); <u>Bennett</u> v. <u>City of Holyoke</u>, 362 F.3d 1 (1st Cir. 2004); <u>Dirrane</u> v. <u>Brookline Police Dep't</u>, 315 F.3d 65 (1st Cir. 2002). It is unclear how far such claims can survive the Supreme Court's recent decision in <u>Garcetti</u> v. <u>Ceballos</u>, 547 U.S. 410, 421 (2006), which ruled that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."

Virtually all of the "protected conduct" relied on by the plaintiffs was speech-related activity that arguably was done "pursuant to their official duties"; but it is unclear how far the Supreme Court intends to carry <u>Garcetti</u>, and the Massachusetts Whistleblower Statute offers quite similar protection unaffected by <u>Garcetti</u>.[3] Although the First Amendment (implemented through § 1983 or the Massachusetts Civil Rights Act) differs from the Whistleblower Statute in many incidents, the core difficulty in this case is common to both: the difficulty of proving that Cachopa

---

[3]The Whistleblower Statute imposes liability on the state, local towns, and other public entities that retaliate against an employee through "adverse employment action" for specified conduct, Mass. Gen. Laws ch. 149, § 185(a), (b); and the protected conduct, subject to certain conditions, includes--to paraphrase two of the subsections that follow: (1) disclosing to a supervisor or "public body" activity by the employer that the complaining employee believes to be unlawful or dangerous; and (2) providing information or testimony to a "public body" conducting an investigation into unlawful conduct or a threat to safety. <u>Id.</u> ch. 149, § 185(b).

and Ciampa took various of their actions in order to retaliate for protected activity.

The Stoughton Police Department was surely in turmoil in the 2004-2005 period. In a relatively brief window, the chief position was held by Cachopa, Chamberlin, Saccardo, Cachopa again and then Ciampa who was closely allied with Cachopa. Cachopa was himself ultimately convicted in 2009 of being an accessory after the fact to more serious misconduct of which another officer (Sergeant David Cohen) was convicted.[4] Officers who had not supported Cachopa or the recall campaign, including Chamberlin and Wohlgemuth, seem to have been subject to harassment after Cachopa regained authority and during Ciampa's tenure.

But it remained the plaintiffs' task to establish that Cachopa, Ciampa or both took adverse action against one or both of the plaintiffs motivated at least in part by their protected conduct, and in this respect the plaintiffs' case rested primarily on soft inference as against flat denials by both the defendant officers. In particular, plaintiffs had no direct proof that either of the two defendant officers knew that Chamberlin had instigated the special prosecutor's inquiry or that either

---

[4]The Massachusetts Supreme Judicial Court later reversed Cohen's conviction and remanded the case for a new trial, on the grounds that the trial court had violated Cohen's right to a public trial by restricting access to the courtroom during jury selection. Commonwealth v. Cohen, 919 N.E.2d 628 (Mass. 2010).

plaintiff had testified to the grand jury, and both defendants denied knowing about who testified before the grand jury.

Further, certain of the small administrative steps complained of by the plaintiffs could be taken as hostile or defended as consistent with regulations, so it is not easy to work backwards and conclusively infer a malign motive from the acts themselves. Other problems included the uncertainty as to significant compensable harm, lack of medical evidence of emotional harm, and the fact that Chamberlin was on leave during most of the events. This, then, looks like a suitable case for a jury to sort out cause, motive and effect; and when the jury got the claims against Cachopa, it rejected them on the merits.

It is true that the district court let the case against Cachopa go to the jury in the second trial while it directed a verdict in Ciampa's favor in the first. But Cachopa was the chief when the principal incidents occurred; Ciampa was his creature as his effective deputy promoted to that spot over the heads of the lieutenants; and the most plausible case against both rested on the notion that they were cooperating to inflict petty misery on the plaintiffs, one of whom had supplanted Cachopa and the other of whom had failed to support him.

The jury in the second trial was allowed to consider practically all of the claimed acts of retaliation. A number of these acts were done by Cachopa directly (changing the plaintiffs'

-12-

shift and shirt colors; appointing Ciampa as executive officer over the heads of the lieutenants and reducing the plaintiffs' responsibilities; sending Chamberlin letters demanding doctor's notes). Others were, by Cachopa's own admission, done at his direction by his deputy, Ciampa (moving Chamberlin and Wohlgemuth to a different office; imposing various restrictions on Chamberlin for not requalifying with his firearm). A few acts were presented to the jury without clear evidence as to whether Cachopa or Ciampa was the primary actor (changing plaintiffs' training locations).

In other words, for almost all the acts of alleged retaliation, Cachopa was either the principal actor or at least as culpable as Ciampa. Nonetheless, the jury found that Cachopa did not retaliate against the plaintiffs for protected conduct. The jury's determination that Cachopa was not liable "fatally eviscerated" the plaintiffs' claims against Ciampa and the defendants from the Town. Earle v. Benoit, 850 F.2d 836, 845 (1st Cir. 1988).[5] Earle is not conclusive--the fatal determination there was in the same trial--but the principle is the same, namely,

---

[5]Earle is far from the only example. See, e.g., Goulet v. New Penn Motor Express, Inc., 512 F.3d 34, 43 (1st Cir. 2008); Senra v. Cunningham, 9 F.3d 168, 174 (1st Cir. 1993); Dixon v. City of Lawton, 898 F.2d 1443, 1449 (10th Cir. 1990); James v. Nico Energy Corp., 838 F.2d 1365, 1373 (5th Cir. 1988); Mello v. K-Mart Corp., 792 F.2d 1228, 1231 (1st Cir. 1986); Juneau Square Corp. v. First Wisconsin Nat'l Bank, 624 F.2d 798, 814 n.17 (7th Cir. 1980); Janich Bros., Inc. v. American Distilling Co., 570 F.2d 848, 855 (9th Cir. 1977).

that courts do not have further proceedings based on harmless errors.

Appellate review after the grant of a directed verdict usually involves a measure of speculation about how the jury would have decided if a directed verdict had been denied; but no speculation is needed here because the same claims were effectively tried and lost in the second case. This is a rare occurrence and perhaps without precedent; but that should hardly prevent us from exercising common sense. Yes, the Seventh Amendment provides for jury trials; but, directed verdicts and harmless error are established qualifications (so too are waiver, stipulation and estoppel). Whether the case against Ciampa was fairly tested by the second trial is a separate question.

A few alleged retaliatory acts--for which Ciampa and the Town were the primary actors--were not squarely presented to the jury in the second trial. After Ciampa became acting chief, he directed Chamberlin to undergo a medical examination to determine his fitness to return to duty; issued warnings to Wohlgemuth for comments made to other officers; and sent Wohlgemuth a letter about sick time abuse. These incidents not only fail as a retaliation claim, cf. Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218 (1st Cir. 1989) (en banc), but add no real weight to the more serious incidents that occurred while Cachopa was chief.

-14-

Thus, the medical examination was required for officers out of work for five days or more due to off-duty injury or illness, and the dispute centered around a possible conflict of the policy with the union contract; Wohlgemuth did not seriously deny making some negative comments about other officers; and whether he marginally exceeded his sick time is unclear even after reading relevant testimony. By contrast, the list of alleged wrongful acts occurring while Cachopa was chief is far longer and included at least a few of some substance.[6] This is presumably why the court did not direct a verdict for Cachopa; even so, Cachopa prevailed.

As for the Town, it was within its rights in filing suit against Chamberlin over his retirement incentive. Chamberlin did not retire as promised for whatever reason, and the Board could legitimately seek to enforce the agreement; engaging in protected conduct did not insulate Chamberlin from these consequences. See Blackie v. Maine, 75 F.3d 716, 723-24 (1st Cir. 1996). According to Chamberlin's own testimony, the Board's desire that he retire predated much of the arguably protected conduct.

Nowhere do plaintiffs explain how they could have prevailed against Ciampa when the jury rejected counterpart claims

_____

[6]The ones of some arguable substance included Cachopa's altering of Chamberlin and Wohlgemuth shifts; Cachopa's appointment of Ciampa; and several other actions taken by Ciampa but seemingly at Cachopa's direction: a requirement that Chamberlin requalify to carry firearms and confinement to station until this occurred; a reduction in Wohlgemuth's duties; and an official reprimand in Chamberlin's personnel file.

against Cachopa. Instead, they argue that the second trial was itself flawed: of their twelve claims in this court, eight assert errors in the second trial. Of course, the outcome of the second trial could not insulate defendants if it were itself flawed; but a number of the claims involve trial-court judgment calls about which little need be said and the most important of the challenged rulings--discussed next--do not comprise reversible error.

Most important, plaintiffs argue that the district court erred by excluding a report that the Town commissioned from attorney Marc Terry (the "Terry Report") in response to the plaintiffs' letters alleging a hostile work environment. Terry interviewed a number of witnesses regarding the plaintiffs' allegations and concluded that Cachopa had retaliated against the plaintiffs both for their cooperation with the grand jury investigation and for failing to support Cachopa's effort to remain as chief.

In excluding the report, the district court stated, "I think given its timing and given the fact that it was requested in July of 2004 and we don't get it until October of 2005 . . . . [and] given its level of generality, I think it's unduly prejudicial." The reference to timing is unclear to us and the reference to generality is perhaps confusing; the report was fairly detailed as to the underlying events. But in all likelihood the district court meant that the utility of the report to plaintiffs

-16-

was its _final assessment_, which their brief underscores, that Cachopa was not credible in his denials as to what he did and why.

Cachopa's credibility as to what he did and why was central to the second trial, but the underlying evidence of events bearing on that was available to the plaintiffs. To superimpose Terry's evaluation on what the jury was expected to decide served no useful purpose: it was the jury's task to decide whether to believe Cachopa. Terry was not qualified or offered as an expert on "credibility"; and to treat his independent judgment as evidence would simply weight one side of the scale to Cachopa's disadvantage.

It thus does not matter whether Terry's report avoids a hearsay objection by virtue of Rule 803(8)(c) or otherwise;[7] Rule 403 independently permits exclusion of evidence that is unduly prejudicial and to exclude the report on this ground was not an abuse of discretion. This would be a different case if plaintiffs were pointing us to raw facts that Terry had uncovered and for which evidence was not readily available to plaintiffs themselves.

---

[7]Federal Rule of Evidence 803(8)(c) creates a hearsay exception for reports of "public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The plaintiffs also cite Rule 801(d)(2)(C), which covers statements by authorized persons, and Rule 801(d)(2)(D), which covers statements by agents.

The plaintiffs also argue that the district court erred by refusing to allow them to examine Cachopa over his role in the initial investigation of Cohen, whose conduct was the subject of the later inquiry by the special prosecutor and grand jury investigation. The plaintiffs claim that Cachopa opened the door to the issue by testifying that he himself had brought the matter before the district attorney in 2003, and that they were denied the chance to demonstrate fully Cachopa's misconduct in this matter.

However, the transcript indicates that the district court did not flatly bar the plaintiffs from examining Cachopa on the Cohen investigation. Rather, Cachopa was the first witness to testify in the case, and the district court seemingly believed that the jury should first be apprised of any wrongs that Cachopa did to the plaintiffs before digressions into Cachopa's role in the Cohen matter. The court ruled that "[y]ou better go to something that's relevant and then you can come back to this. You can come back to it . . . if it's relevant." The plaintiffs tried again several questions later, in response to which the court sustained an objection "without prejudice to your returning to it."

So far as appears, the plaintiffs made no effort to question Cachopa on the Cohen matter again. The Cohen matter, and Cachopa's conduct in relation to it, was arguably "relevant" under Rule 401 of the Federal Rules of Evidence--for example, because it bore on his motivation to retaliate against Chamberlin for

-18-

prompting an inquiry into the matter. But the district court "enjoy[s] wide latitude in matters concerning the ordering of proof and the presentation of evidence," Morales Feliciano v. Rullan, 378 F.3d 42, 57 (1st Cir. 2004), cert. denied, 543 U.S. 1054 (2005), and plaintiffs were free to return to the Cohen matter after they adduced evidence that Cachopa had taken steps against the plaintiffs for which his motive was relevant.

The plaintiffs next argue that the district court erred by instructing the jury to determine whether the plaintiffs' December 7 letters alleging a hostile work environment were protected conduct under the "matters of public concern" and interest-balancing tests used by the Supreme Court, at least prior to the exception now carved out by Garcetti. Whether speech is constitutionally protected is ordinarily a matter for the judge, not the jury;[8] but the plaintiffs did not object to this aspect of the jury instructions and so the objection is waived, absent plain error--a stiff test in civil cases, see Diaz-Seijo v. Fajardo-Velez, 397 F.3d 53, 56 (1st Cir. 2005), which plaintiffs do not meet.

The plaintiffs also challenge the district court's failure to instruct the jury that the plaintiffs' cooperation with

---

[8]Connick, 461 U.S. at 148 n.7 ("The inquiry into the protected status of speech is one of law, not fact."); Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) ("[I]t is the judge who decides as a matter of law the issues in the two steps Garcetti identifies."); Lewis v. City of Boston, 321 F.3d 207, 219 (1st Cir. 2003).

the special prosecutor was protected under the First Amendment. As two senior officers in the police department, it was within the scope of both plaintiffs' duties to cooperate with the district attorney and the special prosecutor in investigating alleged criminal activity within the police department. Wohlgemuth shared responsibility for internal investigations, and Chamberlin had launched the investigation as part of his duties as chief. The district court correctly ruled that this conduct was not protected by the First Amendment under <u>Garcetti</u>.

We are not suggesting that <u>Garcetti</u> applies every time a police officer has conversations with a prosecutor. What constitutes official duties will necessarily vary with the circumstances including the rank of the officer, his areas of responsibility and the nature of the conversations; but in this case the facts just summarized are sufficient. The district court also instructed the jury that cooperation with the grand jury <u>was</u> protected speech; but this instruction, being favorable to plaintiffs, is not before us and need not be addressed.

The district court also told the jury that the plaintiffs presented "no medical testimony" that distinguished emotional distress based on "protected speech from the other divisiveness in the department," and "you need such testimony." No per se rule requires expert testimony for an award of compensatory damages based on emotional distress, <u>e.g.</u>, <u>McDonough</u>, 452 F.3d at 22, but

if there was error, it was harmless.  The jury was told to award at least nominal damages if a protected speech violation occurred and did not do so--so the predicate for any damages was absent.

The remaining claims of trial error require no detailed discussion.  The plaintiffs are wrong that the district court precluded proof of the shift changes and shirt color issue pressed by plaintiffs; the district court's restrictions on time allowed to each side were within the district court's authority; and a complained of comment by the district court--itself somewhat opaque--is not a basis for a new trial.

The judgment is <u>affirmed</u>.  Each side shall bear its own costs on this appeal.

<u>It is so ordered.</u>


**-Dissenting Opinion Follows-**

**LIPEZ, <u>Circuit Judge</u>, dissenting in part.** Although the majority affirms the district court's grant of a directed verdict[9] in favor of Ciampa, it does not do so on the familiar ground that no reasonable jury could find Ciampa liable for retaliation based on the evidence presented at the first trial. Instead, it concludes that any error in the granting of the directed verdict for Ciampa was "harmless" because of the rejection of plaintiffs' claims against Cachopa by a different jury in a subsequent trial. In my view, this harmless error analysis is unprecedented and unsupportable. Therefore, I respectfully dissent from the decision to affirm the directed verdict in favor of Ciampa.[10]

## I.

Because it is important for understanding the flaws in the majority's harmless error analysis, I briefly summarize the relevant procedural history. In January 2008, plaintiffs proceeded to trial on their retaliation claims against Ciampa, Cachopa, and other defendants. Early in that trial, the court granted a

---

[9] We note that Federal Rule of Civil Procedure 50 was amended in 1991, and "the term judgment as a matter of law was adopted to refer to preverdict (directed verdict) and postverdict (judgment notwithstanding the verdict) motions with a terminology that does not conceal the common identity of two motions made at different times in the proceeding." <u>Coastal Fuels of P.R., Inc.</u> v. <u>Carribean Petroleum Corp.</u>, 79 F.3d 182, 199 n.14 (1st Cir. 1996) (internal quotation marks omitted). We refer to the district court's ruling as a directed verdict to remain consistent with the majority's terminology.

[10] I join the majority's decision in all other respects.

mistrial on all claims against Cachopa. Plaintiffs continued to present evidence against the remaining defendants. At the close of their case, the court granted a directed verdict on all claims against Ciampa and the remaining defendants. Following the court's denial of plaintiffs' motion for reconsideration and for new trial, plaintiffs appealed. Several weeks later, plaintiffs proceeded to trial on their retaliation claims against Cachopa. Plaintiffs' allegations against Cachopa, although overlapping with their allegations against Ciampa, were not identical. The jury returned a verdict for Cachopa, and plaintiffs appealed from that verdict. Plaintiffs' two appeals, from the dispositions in the first and second trials, were later consolidated in the proceeding now before us.

## II.

We review de novo the district court's decision to grant a directed verdict. Acevedo-Feliciano v. Ruiz-Hernández, 447 F.3d 115, 121 (1st Cir. 2006). The district court could properly grant a directed verdict for Ciampa at the close of plaintiffs' case in the first trial only if, based on the evidence presented at the time of its ruling, "a reasonable jury would not have a legally sufficient evidentiary basis to find for [plaintiffs]." Fed. R. Civ. P. 50(a). In our review of the grant of a directed verdict, we apply the same standard as the district court. Id. We must "examine the evidence and all fair inferences in the light most

favorable to the plaintiff[s] and may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Id. (internal quotation marks omitted). Viewing the evidence in this light, we may uphold the directed verdict for Ciampa only if no reasonable jury could find defendant liable based on the evidence presented by plaintiffs at the first trial. See Acevedo-Feliciano, 447 F.3d at 121.

In order to prevail on their retaliation claims, plaintiffs had to show that they "engaged in constitutionally protected conduct and that this conduct was a substantial or motivating factor in the alleged adverse employment action." Welch v. Ciampa, 542 F.3d 927, 936 (1st Cir. 2008). The majority acknowledges that plaintiffs engaged in arguably constitutionally protected conduct, that the adverse actions by Cachopa and Ciampa, viewed collectively, were arguably harmful enough to support a viable claim, that the parties proffered conflicting evidence as to motive, and that this was "a suitable case for the jury to sort out cause, motive and effect." However, having recognized these central disputes suitable for jury determination, the majority does not then evaluate the directed verdict on the merits, assessing whether a reasonable jury could find Ciampa liable based on the evidence presented at the first trial. Instead, the majority looks to the second trial, in which Ciampa was not a party, and views that trial as a proxy for what would have happened if plaintiffs'

-24-

claims had gone to the jury in the first trial. The majority concludes that even if the district court erred in directing a verdict for Ciampa, any error was harmless, because similar retaliation claims against Cachopa went to a jury in the second trial and that jury ultimately found in his favor. None of the parties raised this harmless error argument in their briefing.[11] That is not surprising. There is no precedent for such an application of harmless error.

As a general matter, under the harmless error rule, we disregard "errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111; see also Fed. R. Civ. P. 61. In the ordinary harmless error case, an error made in the proceedings leading up to the final judgment -- for example, an erroneous evidentiary ruling -- is deemed harmless to the ultimate disposition.

---

[11] Instead, defendants contended in their briefing, in the traditional manner, that no reasonable jury could find for plaintiffs on their retaliation claims based on the evidence presented at the first trial, and therefore the directed verdict was properly granted. Defendants contended, inter alia, that there was no evidence Ciampa or Cachopa knew that plaintiffs cooperated with the special prosecutor or testified before the grand jury, and that any retaliation that occurred after plaintiffs' December 2004 hostile work environment letters did not rise to the level of an adverse employment action. The only suggestion by defendants of an argument even resembling the majority's harmless error analysis is their statement, in a footnote, that "the jury verdict in Cachopa's favor in Trial Two further supports the reasonableness of the Court's entry of a Directed Verdict in Trial One."

In certain narrow factual circumstances, courts have concluded that an error in the <u>final disposition</u> -- for example, an erroneous directed verdict -- was harmless in light of subsequent proceedings. For example, in <u>Earle</u> v. <u>Benoit</u>, 850 F.2d 836, 840 (1st Cir. 1988), the primary authority relied on by the majority for its harmless error analysis, the plaintiff, Earle, alleged that defendant police officers had conspired to deprive him of his civil rights by subjecting him to unlawful arrest, illegal searches, excessive force, and other harassment. At the close of Earle's case before the jury, the court directed a verdict in favor of defendants on Earle's conspiracy claim, but permitted his other claims to go to the jury. <u>Id.</u> at 837. That jury ultimately returned a verdict for defendants, responding negatively to special jury questions regarding whether the alleged unlawful arrest, illegal searches, and use of excessive force violated Earle's civil rights. <u>Id.</u> at 845.

The <u>Earle</u> court concluded that the directed verdict was erroneously granted because "there was sufficient circumstantial evidence (had the jury found in Earle's favor on the substantive claims) for a reasonable jury to have inferred a conspiracy." <u>Id.</u> at 844. Nevertheless, this error was harmless because a § 1983 conspiracy requires an "actual deprivation of a right secured by the Constitution and laws," and therefore the jury's ultimate rejection of Earle's underlying civil rights claims "fatally

eviscerated Earle's conspiracy claim." Id. at 845 (internal quotation marks omitted).[12] The court reasoned that, in a real and practical sense, even if the district court had permitted Earle's conspiracy claim to go to the jury, that claim would have been rejected by the jury. Given the jury's findings on Earle's claims of significant civil rights violations, the jury could not have also found defendants liable for a civil rights conspiracy. Id. Moreover, "as a practical matter," in light of the jury's consistent rejection of Earle's civil rights claims, it was "inconceivable" that "the jury would have found for plaintiff on the closely related conspiracy charge." Id.; see also Goulet v. New Penn Motor Express, Inc., 512 F.3d 34, 43 (1st Cir. 2008) (finding wrongly directed verdict harmless "where the jury's ultimate verdict necessarily defeats the claim" on which directed verdict was erroneously granted (emphasis added)).[13]

---

[12] The court acknowledged that Earle provided evidence of other more trivial confrontations with police, such as being stopped for alleged traffic violations, but concluded that no jury could have found that any of these incidents constituted a deprivation of a constitutional right, as required for a § 1983 civil rights conspiracy. Id. at 845.

[13] My research has uncovered a smattering of other cases, from our own circuit and others, applying harmless error analysis to a directed verdict. Like Earle, these decisions have found harmless error where the jury verdict "necessarily defeats the claim" on which a directed verdict was incorrectly granted. Goulet, 512 F.3d at 43; see id. at 42-43 (concluding that any error in directed verdict for employer on plaintiff's hybrid Labor Management Relations Act § 301 claim was harmless, where the jury's ultimate rejection of plaintiff's § 301 claim against union was "fatal" to claim against employer); see also, e.g., Uphoff-Figueroa v.

-27-

As I explain more fully below, this case is fundamentally different from Earle for two reasons. First, the directed verdict for Ciampa and the jury verdict for Cachopa occurred not in a single trial, but in two separate trials that culminated in two separate appeals. Second, given the nature of plaintiffs' claims and the particular facts of this case, the jury verdict for Cachopa did not necessarily defeat plaintiffs' claims against Ciampa.

### III.

In Earle, as noted, the directed verdict and the ultimate jury verdict occurred in the course of a single trial proceeding. Thus, the Earle court concluded that given the jury's findings on

Alejandro, No. 08-1921, 2010 WL 728784, at *7 (1st Cir. Mar. 4, 2010) (holding that even if court erred in directing verdict for employer on plaintiff's state law retaliation claim, it was harmless given the jury's finding for employer on "identical" federal law retaliation claim); Snyder v. Ag Trucking, Inc., 57 F.3d 484, 491 (6th Cir. 1995) (holding that directing a verdict for employer on claim for willful violation of ADEA was harmless error because, given jury's rejection of underlying ADEA claim, it "could not" have found willful violation of ADEA); Dixon v. City of Lawton, Okla., 898 F.2d 1443, 1449 (10th Cir. 1990) (finding any error in failing to submit § 1983 claim to jury harmless, given jury's conclusion that no defendants violated plaintiff's constitutional rights by use of excessive force); Mello v. K-Mart Corp., 792 F.2d 1228, 1231 (1st Cir. 1986) (concluding that error in directing verdict for manufacturer was harmless where jury ultimately rejected product liability claims against vendor, and in reaching that verdict jury necessarily had to find that there was no manufacturing defect); Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 453 (7th Cir. 1982) (holding that any error in directing verdict for defendant on plaintiff's claim for conspiracy to defraud was harmless, given that jury ultimately rejected underlying fraud claim).

-28-

Earle's underlying civil rights claims, that jury could not have rationally found for Earle on his conspiracy claim. Here, of course, the directed verdict on plaintiffs' claims against Ciampa and the jury's rejection of plaintiffs' claims against Cachopa occurred during two separate trial proceedings, which culminated in separate dispositions and separate appeals. In the first trial, following the court's grant of a mistrial on all claims against Cachopa, the court directed a verdict on all remaining claims against Ciampa and the other defendants. Thus, none of plaintiffs' claims reached a jury in the first trial. In the second trial, plaintiffs' claims against Cachopa were tried by a jury, and that jury found for Cachopa.

Although the majority glosses over this somewhat odd procedural history, it cannot be ignored. Here, unlike in Earle and similar cases, we cannot say with any certainty how the first jury would have decided plaintiffs' claims against Ciampa if the directed verdict had not been granted, because that jury made no findings on any of plaintiffs' claims. Without any findings by the first jury, we have no basis for concluding that the first jury could not have rationally found for plaintiffs on their claims against Ciampa. We cannot say, as the Earle court did, that if the district court had not granted the directed verdict, the jury necessarily would have rejected plaintiffs' claims against Ciampa.

-29-

My concerns with the majority's unique harmless error analysis are further heightened by its constitutional implications. Under the Seventh Amendment, plaintiffs have a right to a jury trial on their claims for legal relief under § 1983.[14] City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 709-10 (1999). Of course, it is well-established that the proper grant of a directed verdict does not offend a party's Seventh Amendment right to a jury trial. Galloway v. United States, 319 U.S. 372, 389 (1943); 9B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2522 (3d ed. 2008). The directed verdict procedure is constitutional because a properly granted directed verdict "only deprives the losing party of the possibility of an unreasonable verdict, a possibility not protected by the Constitution." Wright & Miller, supra, § 2522. The analysis applied in Earle, although styled as a harmless error analysis, is a variant on this principle. The Earle court found that, in light of the jury's finding on the underlying civil rights claims, the jury could not rationally find for plaintiff on his conspiracy claim. Thus, the court's decision to withdraw Earle's conspiracy claim from the jury did not violate any right to a jury trial

---

[14] The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

because it only deprived Earle of the possibility of an irrational verdict.

Here, however, the majority does not hold, under either the traditional directed verdict analysis or the Earle harmless error analysis, that the directed verdict for Ciampa in the first trial only deprived plaintiffs of the possibility of an unreasonable verdict at the hands of the first jury. On the contrary, the majority acknowledges that plaintiffs presented evidence at the first trial that was arguably sufficient for the jury to find Ciampa liable for retaliation. In these circumstances, the decision not to allow plaintiffs' claims against Ciampa to be heard by the jury, and to affirm the directed verdict in favor of Ciampa, implicates plaintiffs' Seventh Amendment rights.

**IV.**

Even if the directed verdict for Ciampa and the jury verdict for Cachopa had occurred in the course of a single trial, Earle and similar cases would not support a finding of harmless error here. On the facts of this case, as set forth by the majority, it is clear that the jury verdict for Cachopa did not "necessarily defeat[]" plaintiffs' claims against Ciampa. Goulet, 512 F.3d at 43. Instead, for a variety of reasons, a rational jury could logically reject plaintiffs' retaliation claims against

Cachopa, but at the same time uphold plaintiffs' retaliation claims against Ciampa.[15]

For example, a rational jury could have reached different conclusions about Ciampa and Cachopa on the issue of motive. Plaintiffs' retaliation claims required a showing that Ciampa, Cachopa, or both took adverse actions motivated at least in part by plaintiffs' protected conduct. See Welch, 542 F.3d at 936. The inquiry into motive is highly individualized and fact-specific, requiring an evaluation of the defendant officers' actual, subjective intent. See, e.g., Rivera-Torres v. Ortiz-Velez, 341 F.3d 86, 97 (1st Cir. 2003) (explaining that "subjective intent is an essential element" of analogous political discrimination claim under First Amendment). As the majority acknowledges, there was a central dispute in this case on the element of motive -- plaintiffs' case as to retaliatory motive "rested primarily on soft inference as against flat denials" by Ciampa and Cachopa, and in particular, both defendant officers denied knowing who had testified before the grand jury. A rational jury could well find, based on its assessment of the defendant officers' credibility or for other reasons, that Ciampa and Cachopa had different levels of knowledge about plaintiffs' protected conduct or otherwise had different subjective motives for their actions.

---

[15] Unlike in Earle, no special verdict form or special questions were put to the jury in the second trial, and therefore we cannot know the basis for the jury's verdict for Cachopa.

Similarly, the alleged retaliatory acts by the two defendant officers, although overlapping, were not identical. As the majority acknowledges, plaintiffs also alleged some retaliatory acts "for which Ciampa [was] the primary actor[];" these "were not squarely presented to the jury in the second trial." For example, plaintiffs alleged that Ciampa took several retaliatory acts during the period he served as acting police chief; those acts included directing Chamberlin to undergo a medical examination and issuing letters of warning to Wohlgemuth that were placed in his personnel file.[16]

The majority, relying on Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218 (1st Cir. 1989) (en banc), asserts that these additional acts by Ciampa do not rise to the level of adverse employment actions sufficient to sustain a retaliation claim. However, as the majority acknowledges, plaintiffs' central claim against the defendant officers was that they carried on "a systematic campaign of retaliatory harassment" against plaintiffs in 2004 and 2005. For purposes of evaluating whether this campaign of harassment rose to the level of an adverse employment action, the acts of harassment cannot be isolated and analyzed separately. Instead, the trier of fact must determine

---

[16] In addition, some evidence of adverse conduct, including changes made to plaintiffs' training locations, was presented at the second trial without a clear showing of whether Cachopa or Ciampa was the primary actor.

whether the course of harassment, taken as a whole, "result[ed] in a work situation 'unreasonably inferior' to the norm for the position." Agosto-de-Feliciano, 889 F.2d at 1218; accord Welch, 542 F.3d at 937. Given the somewhat different evidence of harassment by the two defendant officers, a jury could reasonably find that the actions by Cachopa did not amount to a campaign of retaliatory harassment, but the somewhat different actions by Ciampa did.

## V.

In this case, the majority declines to evaluate the directed verdict for Ciampa under the well-established standard -- assessing whether, viewing the evidence presented at the first trial in the light most favorable to plaintiffs, no reasonable jury could find Ciampa liable for retaliation. Indeed, the majority effectively acknowledges that if it did apply the proper standard, focusing on the evidence before the district court at the time of its ruling, the majority would have to conclude that the directed verdict for Ciampa was erroneously granted and remand the case for a new trial. To avoid that result, the majority turns to a harmless error analysis. However, for the reasons discussed above, the majority is also unable to engage in the harmless analysis conducted in Earle. Earle and similar cases do not support a finding of harmless error where, as here, the directed verdict and the subsequent jury verdict occurred in the course of two separate

trial proceedings, as to two different defendants, and as to somewhat different allegations.

In the end, the majority resorts to affirming based on its impression, from the paper record, that Cachopa was at least as culpable as Ciampa, that the jury in the second trial rejected plaintiffs' claims against Cachopa, and that remanding for a new trial on the claims against Ciampa would therefore be pointless. I cannot join in this reasoning, particularly where plaintiffs' constitutional right to a jury trial is implicated. The district court's grant of a directed verdict cannot be affirmed simply because the majority feels as a matter of rough justice that a remand would be a waste of time.