SUPERIOR COURT 
 
 LOCAL 589, AMALGAMATED TRANSIT UNION, PLAINTIFF, vs. MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, DEFENDANT

 
 Docket:
 2184CV02779
 
 
 Dates:
 December 22, 2021
 
 
 Present:
 David A. Deakin Associate Justice
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF’S MOTION FOR PRELIMINARY INJUNCTION
 
 

             On October 20, 2021, the defendant, the Massachusetts Bay Transportation Authority (“MBTA”) issued a “COVID-19 Vaccination Policy” (“the policy”), requiring its employees to be vaccinated against the COVID-19 coronavirus. Under the policy, employees who are not vaccinated and have not secured a medical or religious exemption can be discharged. On November 24, 2021, the plaintiff, Local 589 of the Amalgamated Transit Union (“the union”), which represents MBTA workers, filed this Verified Complaint, which seeks declaratory and injunctive relief. The union seeks an injunction prohibiting the MBTA from enforcing the vaccination policy and ordering the parties to arbitration to resolve their disagreement over its provisions. Because the union has not demonstrated that it is likely to prevail on the merits of the case or that the balance of irremediable harms favors the issuance of an injunction, the Motion for Preliminary Injunction is DENIED.

                                                            -1-

FACTS & PROCEDURAL HISTORY
            On August 19, 2021, Governor Charlie Baker issued “Executive Order 595: Implementing a Requirement for COVID-19 Vaccination for the Commonwealth’s Executive Department Employees” (“Executive Order 595”). In Executive Order 595, Governor Baker called on “[i]ndependent agencies and authorities, public institutions of higher learning, elected officials, other constitutional offices, the Legislature, and the Judiciary . . . to adopt policies consistent with this Executive Order.” Executive Order 595 at p. 3, § 3. Between August 19 and October 19, 2021, the parties engaged in discussions, of varying degrees of formality, about the MBTA’s intention to implement a vaccination policy for its employees. See Barnes Aff.[1] at pp. 2-4, § 3. The union made several proposals; the MBTA agreed to some and rejected others. See id. at pp. 2-3, § c. The parties did not reach an agreement, and on October 20, 2021, the MBTA announced the policy at issue in this case. See MBTA Policy/Procedure No. 7.23, “COVID-19 Vaccination Policy,” appended to the Verified Complaint as “Attachment B.”
            The policy requires employees to be fully vaccinated immediately, [2][3] if they have not

--------------------------------------

[1] References to the Affidavit of Ahmad Barnes Filed in Support of the Massachusetts Bay Transportation Authority’s Opposition to Plaintiff’s Motion for a Preliminary Injunction are denoted by the abbreviation, “Barnes Aff.,” followed by page and paragraph citations. References to the policy are denoted by the word, “Policy,” followed by page and section citations. References to the Collective Bargaining Agreement (“CBA”) are denoted by the abbreviation, “CBA,” followed by page and section citations. References to Impartial Umpire Sheila Mayberry’s “Denial of Union’s Motion for Preliminary Relief Re: Vaccination Policy” (“Denial”), which is Attachment 8 to the Barnes Affidavit, are denoted by the word, “Denial,” followed by a page citation.

[2] The policy, which was issued on October 20, 2021, requires all employees to be fully vaccinated “[a]s of October 18, 2021.” Because the policy permitted employees time to come into compliance, see text infra, its issuance two days after the deadline for compliance, although curious, does not appear to work any significant hardship.

[3] In its pleadings and at the hearing, the union submitted that ninety-four percent of the MBTA’s operating staff is vaccinated. It is not entirely clear to the court whether this also represents the percentage of union members that are vaccinated. Nothing, however, turns on this distinction, if, in fact, it is one.

                                                            -2-

received “approved medical or religious exemption[s].” Policy at p. 2, § III, B. The policy defines full vaccination. See id. It also requires that employees maintain their vaccination by receiving booster shots as recommended by the federal Centers for Disease Control’s Advisory Council on Immunization Practices. See id. at p. 3, § IV. The policy also provides that employees are in “[p]artial compliance” if they have: (1) received the first shot of the Pfizer or Moderna vaccines; (2) scheduled an appointment to receive the Johnson & Johnson vaccines; or (3) have an application pending for a medical or religious exemption. Id. at p. 2, § III, C. The policy requires that employees submit proof of compliance – or partial compliance. The policy sets out a schedule of phased disciplinary actions that the MBTA can take if an employee is non- compliant.[4] The disciplinary steps culminate in administrative separation from the MBTA. See id. at p. 5, § VII. The disciplinary process is paused automatically if the non-compliant employee comes into partial compliance, and it ends – with associated documents removed from the employee’s record – if the employee becomes fully compliant before administrative separation. See id.

-------------------------------------

[4] According to the policy, a non-compliant employee initially is issued a “First Notice of Non-Compliance.” Policy at p. 4, § VII. This notice instructs the employee to come into compliance and instructs the employee to attend a “follow-up compliance interview . . . approximately four weeks from the date of the [first] notice.” Id. After that interview, employees who continue not to comply will be issued a “Final Notice of Non-Compliance.” Id. Employees issued that notice will be suspended for five days, referred to the Employee Assistance Program, and ordered to appear at a second “follow-up compliance interview . . . approximately three weeks from the date of the [final] notice.” Id. An employee who remains non-compliant is then “[d]isqualified” from work and will not be paid, or accrue benefits. Sixty days after an employee’s disqualification, the employee can be “[a]dministratively [s]eparated” from the MBTA. Id. at p. 5, § VII.

                                                            -3-

            On October 29, 2021, the union sent a letter opposing the policy to MBTA General Manager Steve Poftak. Verified Complaint, Attachment C, p. 3. The letter was termed “a grievance.” Id. The grievance expressed the union’s dual objections that the policy could not be implemented unilaterally by the MBTA and that, in any event, even if the MBTA could implement a vaccination policy without bargaining, the policy promulgated was unreasonable. See id. The letter requested that the dispute be heard by the impartial umpire designated in the collective bargaining agreement, Sheila Mayberry. See id. The MBTA objected by letter dated November 1, 2021. See Barnes Aff., Attachment 5.
            On November 3, 2021, the union filed a “Motion for Preliminary Relief” and supporting memorandum of law with Umpire Mayberry. Id., Attachment 6. The Motion for Preliminary Relief sought an Order that, in relevant part, prohibited the MBTA from enforcing its vaccination policy and ordering it to participate in arbitration. See id. That day, the MBTA responded with a letter to the union. Id., Attachment 7. The subject line of the letter was “Step 2 Grievance Answer re: COVID-19 Vaccine Policy.” Id. The letter was a detailed response to the union’s grievance of October 29, 2021. The heart of the letter was the MBTA’s position that, because the “issuance of the Policy is within the scope of . . . [the MBTA’s] inherent management rights, pursuant to M.G.L. c. 161A, § 25, and by statute is specifically excluded from collective bargaining,” the dispute was not arbitrable. Id.
            In response to the union’s filing, the Umpire held a hearing with the parties over the telephone on November 5, 2021. Barnes Aff. at p. 7, ¶ 19. Six days later, she issued a “Denial of Union’s Motion for Preliminary Relief Re: Vaccination Policy” (“Denial”). Barnes Aff. at

                                                            -4-

Attachment 8. Umpire Mayberry concluded that her authority under the Collective Bargaining Agreement (“CBA”) between the parties did “not include preemptive action or extraordinary powers to enjoin a policy or the authority to order the Parties to negotiate terms of a policy prior to a hearing on the merits of alleged harm created by the policy.” Denial, p. 6.
            The union brought this civil action on December 6, 2021. As of the date of the hearing, according to the union, ninety-four percent of the MBTA’s operating staff was vaccinated. See note 3, supra. The court held a hearing on December 20, 2021, and took the matter under advisement.
ANALYSIS
            To establish an entitlement to injunctive relief, the union must establish that: (1) it is likely to succeed on the merits of its action; (2) it and/or its members would suffer irreparable harm without the injunction; and (3) the risk of such harm outweighs the risk of similarly irreparable harm to the MBTA. See Doe v. Worcester Pub. Sch., 484 Mass. 598, 601 (2020), citing, inter alia, Packaging Indus. Grp., Inc. v. Cheney (“Cheney”), 380 Mass. 609, 616-617 (1980). Further, because the union seeks to enjoin government action, it must also demonstrate that “the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public.” Garcia v. Department of Hous. and Cmty. Dev., 480 Mass. 736, 747 (2018), quoting Loyal Order of Moose, Inc., Yarmouth Lodge # 2270 v. Board of Health of Yarmouth, 439 Mass. 597, 601 (2003). See also Sampson v. Murray, 415 U.S. 61, 83, (1974), quoting Cafeteria & Restaurant Workers Union, Local 473, A.F.L.-C.I.O. v. McElroy, 367 U.S. 886, 896 (1961) (noting “the well-established rule that the Government has traditionally

                                                            -5-

been granted the widest latitude in the ‘dispatch of its own internal affairs’”). The union’s submission does not make this showing.
            “By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law.” Cheney, 380 Mass. at 616. “The preliminary determinations summarized below are ‘based on the affidavits, attached exhibits, and motions furnished by the parties, as well as reasonable inferences from that evidence.’” Ethicon Endo- Surgery, Inc. v. Pemberton, 2010 WL 5071848, at *1 (Mass.Super. 2010) (Lauriat, J.), quoting Fazio v. Bank of Am., 2010 WL 2432024, at *1 (Mass.Super. 2010) (Fremont-Smith, J.). The court also considers the parties' arguments at the hearing.
I. THE UNION’S LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIM
            A. G.L. C. 161A
            Unless the union can demonstrate that it is likely to succeed on the merits of its claim, it is not entitled to injunctive relief. Whether the union will succeed on its claims depends entirely on whether the MBTA’s vaccination policy affects employees’ “working conditions,” which are subject to collective bargaining under G. L. c. 161A, § 25, or, instead, is an aspect of the MBTA directors’ “inherent management right,” which are not subject to collective bargaining under the statute. G. L. c. 161A, § 25. Although, unsurprisingly, there is no case directly on point, the statutory language and the holdings in analogous cases lead to the conclusion that the MBTA’s vaccination policy falls under its directors’ “inherent management right” and is therefore not subject to collective bargaining. Id.
            The MBTA was created – and is governed – by G. L. c. 161A. Section 25 of the statute authorizes its directors “to bargain collectively with labor organizations representing employees

                                                            -6-

of the [MBTA] . . . and to enter into agreements, with such organizations relative to wages, salaries, hours, working conditions, the assignment of work schedules and work locations on the basis of seniority” Id. The statute then sets out issues subject to collective bargaining. Section 25 further provides, however, “that the directors shall have no authority to bargain collectively and shall have no authority to enter into collective bargaining agreements with respect to matters of inherent management right” Id. (emphasis supplied). The statute then lays out the types of actions that constitute “management right[s].” Id. Among these are the rights: (1) “to direct, appoint, and employ officers, agents and employees and to determine the standards therefor,” and (2) “to discharge or terminate employees” subject to restrictions not relevant in this case. Id. at §§ i, ii (emphasis supplied).
            In interpreting a statute, the court follows its language if it is “plain and unambiguous.” Emma v. Massachusetts Parole Bd., 488 Mass. 449, 453 (2021), quoting, inter alia, Sharris v. Commonwealth, 480 Mass. 586, 594 (2018). Section 25 of G. L. c. 161A authorizes the MBTA’s directors to hire employees and, as part of that authority, permits them “to determine the standards” for employment. G.L. c. 161A, § 25. It also empowers the directors “to discharge or terminate employees” Id. at § 2. The MBTA’s vaccination policy is a “standard” for employment, and its implementation can, in cases of ongoing non-compliance, result in “discharge.” Id. at i, ii. It therefore involves “inherent management right[s],” which, by statute, cannot be the subject of collective bargaining. Id.
            The union urges the court to conclude that the vaccine policy involves its members’ “working conditions” and is therefore subject to collective bargaining. This argument fails for three reasons. First, by including standards for employment and the authority to discharge in the

                                                            -7-

definition of “matters of inherent management right,” the statute expressly excludes them from the universe of matters subject to collective bargaining. Id. Second, the right to set conditions for employment and to discharge are different in kind from the matters that the statute lists as proper subjects of collective bargaining: “wages, salaries, hours, working conditions, the assignment of work schedules and work locations on the basis of seniority, including (a) hours of work each day and days worked each week . . . and (b) the filling of vacancies by promotion or transfer of qualified applicants on the basis of seniority, health benefits, pensions and retirement allowances” Id. Each of these issues affects the conditions under which employees work, rather than their qualification for employment and/or eligibility for continued employment. This further indicates that the policy at issue here is a matter of “inherent management right” rather than one pertaining to “working conditions.”
            Finally, the union directs the court’s attention to no case in which a court has held that a policy like this one is subject to the collective bargaining requirements of G. L. c. 161A, § 25. The union’s citations to Newton v. Labor Relations Commission, 388 Mass. 577, 572 (1983), and Commonwealth of Massachusetts, 27 MLC 1, 5 SUP-4304 (June 30, 2000), are unavailing. In both of those cases, the courts concluded that the issues in question were appropriate subjects for collective bargaining. This distinguishes them from this case, in which the policy is not. See supra. Moreover, both cases apply G. L. c. 150E, § 10(a)(5), which does not apply to the MBTA. See G. L. c. 150E, §1 (excluding from definition of “‘employer’ or ‘public employer’ . . . authorities created pursuant to chapter one hundred and sixty-one A”); G. L. c. 161A, § 25 (“The provisions of general or special laws relative to rates of wages, hours of employment and working conditions of public employees, shall not apply to the [MBTA] nor to the employees

                                                            -8-

thereof, but the authority and its employees shall be governed with respect to hours of employment, rates of wages, salaries, hours, working conditions, health benefits, pensions and retirement allowances of its employees by the laws relating to street railway companies.”).[5]
            The most closely analogous case to this one cited by either of the parties is Local 589, Amalgamated Transit Union v. Massachusetts Bay Transportation Authority (“Local 589”), 1991 WL 11692423 (Mass. Super. 1991) (King, J.). In that case, a former justice of this court concluded that the MBTA’s drug screening policy, which also could result in termination, “was within its inherent management rights and not subject to collective bargaining.” Local 589, 1991 WL 11692423. The court notes, additionally, that another superior court justice recently reached a similar conclusion in a similar case. See State Police Ass’n of Mass. v. Commonwealth, (“State Police Assn.”) 2184CV02117 (Mass. Super. 2021) (Cowin, J.) (rejecting plaintiff union’s application for injunctive relief from vaccination requirement pending collective bargaining). Cf. also Jamieson v. Charles D. Baker, Governor of the Commonwealth, 2185CV0981 (Mass. Super. 2021) (Reardon, J.) (Governor’s Executive Order 595 does not violate state employee’s due process or equal protection rights). In this context, the court notes that, at the hearing, counsel for the union could draw the court’s attention to no case in any jurisdiction in which a court has

-------------------------------------

[5] The union’s reliance on cases involving preliminary injunctions in aid of arbitration is equally unpersuasive. Both of the cases cited by the union – Teachers Association of the Japanese Educational Institute of New York, Inc. v. Japanese Educational Institute of New York, 724 F. Supp. 188 (S.D.N.Y. 1989) (“Teachers Ass’n of the Japanese Educational Institute”) and Local 1266, International Association of Machinists v. Panoramic Corp., 668 F. 2d 276 (7th Cir. 1981) – interpreted the federal Norris-LaGuardia Act, 29 U.S.C. §§ 101-115, which is not applicable here. The Norris-LaGuardia act generally “prohibit[s] injunctions in peaceful labor disputes over arbitral issues.” Teachers Ass’n of the Japanese Educational Institute, 724 F. Supp. at 191. The United States Supreme Court, however, “has allowed courts to consider the propriety of an injunction where necessary to preserve the arbitral process.” Id., citing Boys Mkts., Inc. v. Retail Clerk’s Union Local 770, 398 U.S. 235 (1970). In both cases the union relies on, the court concluded that the disputes in question were arbitrable, which is not true in this case.

                                                            -9-

enjoined enforcement of a COVID-19 vaccine mandate on the grounds that it required collective bargaining prior to adoption. Application of G. L. c. 161A, § 25, thus leads to the conclusion that the union is unlikely to succeed on the merits of its claim.
            B. THE COLLECTIVE BARGAINING AGREEMENT (“CBA”)
            The union further argues that the MBTA’s action in implementing the vaccine policy violates the parties’ CBA. Section 100 of the CBA requires the parties to submit to arbitration “any difference [that] arise[s] between them which cannot be mutually adjusted.” CBA at p. 9, § 100. Although this language is quite broad, it is limited by Section 102 of the CBA, which provides that the MBTA “will exercise the exclusive right to set its policy; to manage its business in the light of experience, good business judgment and changing conditions; to determine the amount of service to be run at any and all times; to direct the working forces; to determine the number of its employees at any time; to determine the qualifications for and to select its managerial forces and all new employees; to make reasonable rules and regulations governing the operations of its business and the conduct of its employees; to enforce discipline for violations of rules and other misconduct; and to suspend or discharge its employees for cause.” Id. at p. 10, § 102 (emphasis supplied). Unsurprisingly, this language tracks closely the provisions of the MBTA’s governing statute, G. L. c. 161A. See Section I, supra.
            Apparently recognizing the limitation that Section 102 places on the broad arbitration provisions of Section 100, the union contends that Section 102 is inapplicable in this case because the MBTA’s vaccine policy is unreasonable. The union argues that the policy is unreasonable because the MBTA has never required vaccination – or, indeed, even checked on

                                                            -10-

vaccination status – except as part of the routine medical examinations that are part of the hiring process. The union further contends, somewhat oddly, that the MBTA did not implement a vaccine requirement during the first two years of the pandemic and has never implemented one in the face of other illnesses for which vaccines are available. None of these arguments is persuasive.
            First, it is difficult to imagine how the MBTA could have implemented a vaccine mandate before vaccines were widely available. As this happened in the early part of 2021, it is illogical to suggest that the MBTA delayed for two years in implementing its vaccine policy. The parties do not dispute that the MBTA began discussing a vaccination policy with the union in August 2021. As this was only months after vaccines became widely available – and only a shorter time after their efficacy in combatting the virus was demonstrated – the union’s argument on this point is perplexing, to say the least. So, too, is its comparison of the public health risks presented by other diseases for which vaccines are available. As the United States Court of Appeals for the Sixth Circuit recently observed, “[t]he COVID-19 pandemic has wreaked havoc across America, leading to the loss of over 800,000 lives, shutting down workplaces and jobs across the country, and threatening our economy.” In re: MCP No. 165, Occupational Safety and Health Admin. Interim Final Rule: COVID-19 Vaccination and Testing; Emergency Temporary Standard 86 Fed. Reg. 61402, Nos. 21-7000, et al, at 1 (6th Cir. December 17, 2021). With the possible exception of polio, none of the diseases cited by the union has had the impact on this country that COVID-19 has. Moreover, that the MBTA did not implement a vaccination requirement in the past in cases of public health emergencies in no way suggests that its policy in this case is unreasonable. Cf. id. at 19 (“Even if we assume that OSHA should have issued an

                                                            -11-

ETS earlier, moreover, ‘to hold that because OSHA did not act previously it cannot do so now only compounds the consequences of the Agency’s failure to act.’”), quoting Asbestos Info.
Ass’n, 727 F. 2d 415, 422 (5th Cir. 1984).
            The union further argues that the policy is unreasonable because it does not require MBTA passengers to be vaccinated. Putting aside the practical questions that such a measure would raise – both as to the MBTA’s legal authority to implement it and its impact on operations – the argument does not suggest that the policy is unreasonable. That the MBTA might be able to go even further in protecting public health in no way suggests that taking steps that it clearly has the legal authority to take is unreasonable.
            Finally, the union contends that the policy is unreasonable because the MBTA does not provide workers with the vaccine or permit them to be vaccinated during work hours. This argument requires little discussion. That there may be potential improvements to the existing policy does not indicate that it is unreasonable. Additionally, nothing in the record suggests that the MBTA is unwilling to discuss changes to its policy. Indeed, the record suggests the contrary.
II. THE BALANCE OF HARMS
            That the union is unlikely to succeed on the merits of its claim arguably ends the inquiry. As the balance of harms also dictates the denial of injunctive relief, however, the court addresses it, as well. The union contends that the denial of an injunction will irreparably damage both its members and its collective bargaining rights. The MBTA responds that this is incorrect and, in any event, the scope and impact of the COVID-19 pandemic far outweighs either of those interests. Because the court concludes that neither the union nor its members will suffer irreparable harm, as that term is defined in the law, and that the health risk to both union

                                                            -12-

members and the public far outweighs any such irreparable harm, the court concludes that the balance of harms weighs heavily against issuance of the injunction the union seeks.
            The union’s primary argument is that, in forcing reluctant employees to be vaccinated, the court is irretrievably impinging on their right to bodily autonomy. If, in fact, the policy actually forced employees to submit to vaccination, the court would have to address this issue. As nothing in the policy compels employees to submit to vaccination, however, it does not. Rather, the policy coerces employees to be vaccinated but does not force them. As the MBTA notes, employees who do not qualify for a medical or religious exemption but who nonetheless are resistant to vaccination have the option of resignation – with reservation of limited rehiring rights. Massachusetts courts – and, indeed, courts around the country – have repeatedly held that, absent extraordinary circumstances, discharge from employment “will not support a finding of irreparable injury, however severely [it] . . . may affect a particular individual.” Sampson v.
Murray, 415 U.S. 61, 92 n.68 (1974). See also Cheney, 380 Mass. at 621 (injunction cannot be based on injury fully compensable by money damages); Micro Networks Corp. v. HG Hightec, Inc., 188 F. Supp. 2d, 18, 22 (D. Mass. 2002) (generally, “the possibility of monetary injury does not constitute irreparable harm”).
            Union members who are coerced to resign by, or are discharged pursuant to, the policy can seek redress in the courts. They can bring actions for reinstatement and back pay. Massachusetts case law establishes that reinstatement and back pay can fully compensate someone who is impermissibly dismissed from a position in an unwarranted disciplinary proceeding. Cf. Hosford v. School Comm. of Sandwich, 421 Mass. 708, 717-718 (1996) (reinstatement and damages proper remedy for untenured teacher suspended in violation of her

                                                            -13-

First Amendment rights). Cf. also Ballotte v. Worcester, 51 Mass. App. Ct. 728, 734-735 (2001) (“In comparable situations, reinstatement to the position to which the plaintiff was entitled (without loss of rights such as seniority, tenure, or retirement) together with damages in an amount reflecting what the plaintiff would have earned if not deprived of that new position, less mitigation, have been awarded.”) and cases cited.
            Thus, as the law defines irreparable harm, the union has not demonstrated that its members will suffer any. The court also pauses briefly to note that, at the hearing, counsel for the union conceded that the union did “not contest the science.” The court understands this to mean that the union does not contest the devastating scope of the pandemic, the efficacy of the vaccines in combatting its spread, or that vaccines are one of the most – if not the most – effective means of controlling the virus. Given this reasonable concession, the court observes that, as to union members who have neither medical conditions that prevent them from being vaccinated and/or religious objections to vaccination, it is difficult to see how a policy that compels them to do what is manifestly in the interest of their health and society’s harms them at all, much less irreparably. As the law is clear that, generally, discharge from employment does not constitute irreparable harm that must be weighed in considering an injunction, however, the court need not resolve this broader question.
            Finally, to the extent that the union contends that the policy’s impingement on its collective bargaining rights constitutes an irreparable harm that precludes the issuance of an injunction, the court is not persuaded. First, the absence of an injunction does not prevent the union from pursuing its action for declaratory judgment, even if it is unlikely to succeed on the merits. See Section I, supra. Second, any putative irreparable harm to the union’s collective

                                                            -14-

bargaining rights is far outweighed by the risk of irreparable harm to MBTA passengers and to society. As the court (Cowin, J.) observed in State Police Assn., 2184CV02117, “the [u]nion’s contentions frame the public interest too narrowly, by focusing on its [collective bargaining rights] . . . to the exclusion of everyone else.”
            The public health and safety risk posed by the COVID-19 pandemic is unparalleled in the past century.[6] “COVID-19 is a contagious, dangerous, and sometimes deadly disease” (quotation omitted). Committee for Pub. Counsel Servs. v. Barnstable Cnty. Sheriff’s Office, 488 Mass. 460, 463 (2021). “Despite access to vaccines and better testing, . . . the virus rages on, mutating into different variants, and posing new risks.” In re: MCP No. 165, Occupational Safety and Health Admin. Interim Final Rule: COVID-19 Vaccination and Testing; Emergency Temporary Standard 86 Fed. Reg. 61402, Nos. 21-7000, et al at 1 (6th Cir. December 17, 2021). The MBTA’s vaccine policy is a reasonable response to an exceptionally challenging public health emergency. The risk of irreparable harm to MBTA employees and passengers alike – as well as to the broader society – outweighs any harm asserted by the union resulting from that policy.

-------------------------------------

[6] It is apparently not a straightforward proposition to compare mortality rate of the so- called Spanish Flu global pandemic of 1918-1919 to that of the COVID-19 pandemic. See E. Thomas Ewing, Measuring Mortality In the Pandemics of 1918-1919 and 2020—21, Health Affairs Blog, April 1, 2021. https://www.healthaffairs.org/do/10.1377/ hblog20210329.51293/full/. That we have to look back more than one hundred years for a comparison says much, in itself, about the unusual threat posed by the COVID-19 coronavirus.

                                                            -15-

CONCLUSION AND ORDER

            For the foregoing reasons, the union’s Motion for Preliminary Injunction is DENIED.

@/s/David A. Deakin Associate Justice

@December 22, 2021

                                                            -16